**In the matter of Layton Dexter TRUAX, Debtor.**

**No. 09–40018.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Aug. 25, 2010.

Mark Bulovic, Bulovic Law Firm, LLC, Savannah, GA, for Debtor.

## MEMORANDUM AND ORDER ON UNITED STATES TRUSTEE'S MOTION TO DISMISS

LAMAR W. DAVIS, JR., Bankruptcy Judge.

Debtor filed Chapter 7 on January 6, 2009. *Petition*, Dckt. No. 1. Debtor is a pharmacist with a good income and a comfortable lifestyle. Despite his high income, the U.S. Trustee stipulated that the presumption of abuse under 11 U.S.C. § 707(b)(2) did not arise. *Statement*, Dckt. No. 40 (February 23, 2009). However, the U.S. Trustee did seek dismissal under 11 U.S.C. § 707(b)(3) contending that Debtor filed his petition in bad faith or that the totality of Debtor's financial circumstances demonstrates abuse. *Motion*, Dckt. No. 58 (April 13, 2009). Debtor contends that an unforeseen judgment against him and the collapse of the real estate market precipitated his Chapter 7. *Brief in Opposition*, Dckt. No. 91 (June 7, 2010). After reviewing the parties' stipulations, the briefs submitted on the matter, and relevant case law, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor, a pharmacist by trade, has worked for both CVS and Walmart, and has also worked a second job as a pharmacist for Medical Infusion Technologies ("MIT"). Debtor's wife is a sales representative for a pharmaceutical company, and together they own some commercial property which they rent to MIT and to Portman's Music. *Brief in Opposition*, Dckt. No. 91, ¶¶ 1–2; *Joint Stipulations*, Dckt. No. 89, ¶ 18 (May 6, 2010). In January of 2006, Debtor formed LAST, LLC ("LAST") with Barry Mann. LAST purchased some real property and developed

it for rental or resale, borrowing the money from Coastal Bank. Debtor and Mann personally guaranteed the loan. *Joint Stipulations,* Dckt. No. 89, ¶¶ 3, 4.

LAST received an offer for the developed property, and the two members of the LLC could not agree on a course of action. Mann wanted to keep the property, and Debtor wanted to sell it. To resolve this difference of opinion, Mann purchased Debtor's interest in LAST in March of 2007. At the closing of the sale, the attorney allegedly did not tell Debtor that because of his personal guaranty, he remained liable on the loan to LAST. *Id.* at ¶ 9. A few months after the sale, LAST defaulted on the loan to Coastal Bank. In August of 2008, Coastal Bank obtained a $750,000.00 judgment against Debtor, as guarantor of the loan to LAST. *Id* at 16; *Brief in Opposition,* Dckt. No. 91, p. 3. Coastal Bank then perfected a lien on Debtor's property and garnished 25% of his salary from his employment at both CVS and MIT. *Joint Stipulations,* Dckt. No. 89, ¶ 20. Debtor has unsuccessfully negotiated for forbearance from the garnishments. *Id.* at ¶ 16. Debtor has a potential malpractice claim against the closing attorney for allegedly failing to inform him that he was not released as a guarantor.

After the formation of LAST, in May of 2006, Debtor purchased a new home at 116 Country Club Drive in Savannah, Georgia for $1.5 million (the "New House"). Darby Bank loaned him the money for the purchase and took a $1.35 million deed to secure debt on the New House and a $150,000.00 deed to secure debt on Debtor's old house, located at 11 Half Moon River Court in Savannah, Georgia (the "Old House"). *Id.* at ¶ 6. Debtor also borrowed $100,000.00 from his mother-in-law to prepare the Old House for sale and to make some changes to the New House.

*Id.* at ¶ 5. Debtor later refinanced the New House loan, granting a first position security interest to Credit Suisse First Boston Financial in the amount of $999,900.00. The net proceeds were paid to Darby Bank, which retained a second position deed to secure debt for the remaining $350,000.00. *Id.* at ¶ 7. Debtor also borrowed approximately $18,000.00 from his 401(k) account, $25,000.00 more from his mother-in-law, and $28,000.00 from Home Depot for further remodeling in the New House. *Id.* at ¶ 11.

Needless to say, late 2006 was an inopportune time to purchase a new house and to have one for sale on the market. Debtor was unable to sell the Old House, and had to carry debt on both houses. He fell behind on the payments for the New House and took another loan from his 401(k) of approximately $25,000.00. Debtor has not paid the monthly mortgage on the New House since the petition date over eighteen months ago. *Id.* at ¶ 33. Darby Bank has obtained relief from the automatic stay and intends to foreclose on the New House. *Id.*

### CONCLUSIONS OF LAW

The Trustee has stipulated that there is no presumption of abuse pursuant to 11 U.S.C. § 707(b)(2). *Motion to Dismiss,* Dckt. No, 58, ¶ 9. The Trustee has moved for dismissal pursuant to 11 U.S.C. § 707(b)(3) and contends that the totality of the circumstances demonstrate abuse, and alternatively, that Debtor filed the petition in bad faith. *Id.*

#### A. The Standard

11 U.S.C. § 707(b)(3)(B) provides that "[i]n considering . . . whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption [of abuse] does not arise or is rebutted, the court shall consider [wheth-

er] ... the totality of the circumstances ... of the debtor's financial situation demonstrates abuse."

 "Totality of the circumstances" necessarily requires me to consider every aspect of Debtor's filing. This test is a double edged sword of ambiguity. Congress did not tie bankruptcy courts' hands by limiting the inquiry to a finite list of prohibited activity, but also did not give them unfettered discretion to dismiss for any subjective reason. I am to consider all of the circumstances, in their totality, to discern any abuse of the bankruptcy process. Nevertheless, there is a well-recognized template against which debtors' cases are measured in an effort to create a coherent body of law in this area. Therefore, I return to the multi-prong totality of the circumstances analysis I have applied in the past.

 The most important factor is "whether a debtor has the ability to repay a meaningful portion of his debts from future income...." *In re James*, 414 B.R. 901, 914 (Bankr.S.D.Ga.2008) (Davis, J.). This primary factor is supplemented by consideration of a number of non-exclusive factors, including

(1) Whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity, such as an illness or unemployment;

(2) Whether the debtor is eligible for chapter 13 [or chapter 11] relief; [1]

(3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations.

(4) Whether the debtors could provide a "meaningful" distribution in a chapter 13 case;

(5) Whether the debtor's expenses could be reduced significantly without depriving them and their dependents of necessities, including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; ...

(6) the period of time over which the debts were incurred[; and] ...

[(7) W]hether the debtor has a stable source of future income.

*Id.*

 Because the Code does not call for a mathematical application of a checklist, with a finding of abuse if there are more checkmarks than not, I will discuss only the factors relevant to this case.

## B. Debtor's Ability to Repay

 I begin by addressing the most important factor, Debtor's ability to repay a portion of his debt from future income. Debtor's Amended Schedule I reveals $14,411.39 of combined average monthly income. *Amended Schedule I*, Dckt. No. 53, p. 10. However, Debtor earns a monthly net income from Walmart of ap-

1. Many of my sister courts in New York have considered whether a debtor is eligible for Chapter 11 relief as an element of the totality of the circumstances. *See In re Haddad*, 246 B.R. 27, 33 (Bankr.S.D.N.Y.2000); *In re Aiello*, 284 B.R. 756, 761 (Bankr.E.D.N.Y.2002); *In re Carlton*, 211 B.R. 468, 477, 478 (Bankr. W.D.N.Y.1997). Because Chapter 11 would be the appropriate relief if Debtor's Chapter 7 is dismissed, I adopt this alternative inquiry in such cases. *See also* 11 U.S.C. § 707(b)(1) ("[T]he court ... may dismiss a case filed by an individual debtor ..., or, with the debtor's consent, convert such a case to a case under *chapter 11* or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.") (emphasis added).

proximately $7,247.04.[2] *Statement of Earnings*, Dckt. No. 89, Exhibit H. Debtor also earns a monthly net income from MIT of approximately $3,791.67.[3] *Earnings Statement*, Dckt. No. 89, Exhibit L. Debtor also earns $5,050.00[4] per month from rental property located at 115 Echols Avenue in Savannah, Georgia. *Joint Stipulation*, ¶ 18. Debtor's wife also has a full-time job, and the evidence admitted to the record shows that she earns a monthly net income of approximately $1,588.50 at that job.[5] *Earnings Statement*, Dckt. No. 89, Exhibit O. Finally, Debtor divulged $300.00 of monthly income from the operation of a business or farm. *Amended Schedule I*, Dckt. No. 53, p. 10. Accordingly, Debtor and his wife have a true combined average monthly income of $17,977.21.[6] This is approximately $3,565.82 more per month than Debtor revealed on his Schedule I.

 Debtor's amended Schedule J shows no disposable income—rather it shows a monthly deficit of $5,233.61 (this includes the mortgage payment of $3,250.00 on the Echols Avenue property). In light of the above adjustments, the deficit is actually smaller than reported. The actual monthly shortfall is $1,667.79 (-$5,233.61 of reported income + $3,565.82 of higher actual income). Even this adjusted figure is subject to scrutiny. 11 U.S.C. § 1325(b)(2) defines disposable income as

"current monthly income received by the debtor ... less amounts reasonably necessary to be expended...." This standard requires this Court to determine the reasonableness of the expenses. As such, those figures should be viewed through the lens of factor number 5 (*see supra*, Part A), whether Debtor's expenses could be reduced without depriving him of necessities, and whether Debtor's schedules reasonably reflect Debtor's true financial situation. *In re Johnson*, 241 B.R. 394, 398 (Bankr.E.D.Tex.1999) (interpreting disposable income under 11 U.S.C. § 1325(b) and noting that "[s]ince the definition of 'disposable income' demands a delineation between those expenditures which are 'reasonably necessary' from those which are not, this Court must engage in the unenviable task of scrutinizing the debtor's schedule of income and expenditures.").

## C. Whether Debtor's Expenses Could be Reduced

 Debtor's Schedule J shows $9,123.00 per month in home related expenses.[7] Debtor's Schedule J also reveals that Debtor is spending $1,000.00 per month on recreation, $1,000.00 per month on private school education expenses for children, and $322.99 per month for a new Jeep Wrangler for his teenage son. The Trustee points to these and other expenses as being unreasonable as compared to the

2. Calculated from an average net biweekly paycheck of approximately $3,344.79.

3. Calculated from an average net biweekly paycheck of approximately $1,750.00.

4. The monthly rent amount is reported as a gross number to mirror the format on Schedule I. This Court understands that Debtor *does not net* $5,050.00, but to keep the discussion in a true parallel to Schedule I, the gross amount has been used in this part of the discussion.

5. Calculated from an average net biweekly paycheck from PDI, Inc. of approximately $733.15.

6. Monthly amounts are calculated by multiplying the biweekly amount times 26 (pay periods in a year) and dividing by 12 (months in a year).

7. This includes the mortgage payment of $7,340.00, the homeowner's insurance of $200.00, the property taxes of $1,083.33, home maintenance of $300.00, and the flood insurance of $200.00.

IRS Standard deductions. *Motion in Support of Dismissal*, Dckt. No. 90, p. 5. While those standard deductions have no binding power in this context, they may provide a baseline for examining what expenses may be excessive. *See, e.g., In re Gonzalez*, 378 B.R. 168, 175 (Bankr. N.D.Ohio 2007). This comparison is most persuasive when considering Debtor's home expenses. The IRS Standard deduction for a family of four in Chatham County, Georgia, is $991.00 per month. While this number is not binding on Debtor, the differential of more than 9:1 is shocking and indicative of Debtor's unwillingness to abate his lifestyle even while in the throes of bankruptcy.

■■■ It is also notable that Debtor continues to pay $32.00 per month for a parking spot at the University of South Carolina, $40.00 per month for insurance on an inoperable boat, $325.00 per month in telephone expenses, $1,300.00 per month in food costs, and $500.00 per month in transportation costs (excluding car payments). While these numbers are not individually persuasive of excessive expenditures, they offer collective proof that Debtor has shown no intention of decreasing his expenses to attempt a reorganization. "[W]hile a debtor is not required to live in poverty to defeat a § 707(b) action to dismiss, a debtor may still be required to engage in some good, old-fashioned belt tightening." *In re Scarberry*, 428 B.R. 403, 408 (Bankr.N.D.Ohio 2009) (holding that expenses must be reasonable and necessary). "What expenses are 'reasonably necessary' is a question of fact to be determined in the context of individual debtors and their dependents." *In re Urquhart*, 2009 WL 3785573, *3 (Bankr.C.D.Ill.2009) (citing 2 Keith M. Lundin, *Chapter 13 Bankruptcy*, 3d ed. § 165.1 (2000 & Supp. 2004)); *See e.g., In re Walker*, 383 B.R. 830, 837–38 (Bankr.N.D.Ga.2008) (finding

abuse because debtors had reordered their priorities in order to subsidize their adult children's college expenses).

Debtor has made no convincing argument that his unsecured creditors should, in effect, be footing the bill for his $1,000.00 per month recreation needs, his children's private school, his son's new Jeep, or a $1.4 million house which costs more than $9,000.00 per month to maintain. Clearly, Debtor has the ability, given a reasonable adjustment of his expenditures, to repay some meaningful portion of his debt.

### D. Applying the Other Factors

I first conclude that the $750,000.00 judgment against Debtor constituted an unforeseen calamity. It was a catalyst that, when paired with the sinking real estate market, likely touched off a collapse of Debtor's delicately balanced finances. Second, I also conclude that Debtor made an effort to negotiate some sort of non-bankruptcy agreement with Coastal Bank. *Joint Stipulation*, ¶ 16. Third, I conclude that the majority of the debt was not taken on in anticipation of the impending bankruptcy.

However, other factors weigh in favor of dismissal. First, Debtor is eligible for Chapter 11. 11 U.S.C. § 707(b)(1) expressly contemplates that such eligibility is a factor in this analysis.

■■■ Second, I find that Debtor's expenses could be significantly reduced without depriving his family of any necessities. In fact, Debtor could likely reduce his expenses to a level that would allow a meaningful distribution and still live in comfort. To determine whether Debtor can make a meaningful distribution, this Court considers Debtor's schedules, statements, and other salient facts. *In re James*, 414 B.R. at 914. There is no bright line rule to determine a meaningful

distribution. *Id.* If Debtor were to reduce his expenses, he would be able to provide a meaningful distribution in a Chapter 11, due to his high, stable income. For example, even a reduction by 50% in Debtor's housing expense would generate approximately $54,738.00 per year (half of $9,123.00 × 12), which could be directed to partial repayment of his debts. This would be partially offset by Debtor's annual shortfall of -$20,013.48 (-$1,667.79 × 12). *See supra,* Part B. In total, this adjustment would allow Debtor to pay $34,724.52 per year toward his debt. This number would increase significantly if the expenditures of doubtful necessity ($1,000.00 per month on recreation, $1,000.00 per month on private school education expenses for children, $322.99 per month for a new Jeep Wrangler for his teenage son, $500.00 per month in transportation costs, etc.) were eliminated or substantially reduced.

Third, fifteen days before the filing of the petition, Debtor's wife purchased a new Ford Expedition, financing $26,413.83, and requiring monthly payments of $503.40. *Joint Stipulation,* ¶ 21. While the majority of Debtor's debt was not taken on in anticipation of bankruptcy, I find the act of acquisition a new car shortly before filing the petition troubling.

Fourth, Debtor has a history of stable income from multiple sources which should continue into the future.

In *In re James* I found that the debtor's petition was occasioned by a calamity, but that the schedules revealed significant disposable income, that she had stable, above-median income, that she was eligible for a Chapter 13, and that the totality of her circumstances demonstrated abuse. 414 B.R. at 914. In *In re Allen,* I found that the debtor, a nurse earning $56,000.00 per year, had the ability to decrease her monthly expenses and that she had a stable source of future income. 411 B.R. 913,

923 (Bankr.S.D.Ga.2009) (Davis, J.). While her bankruptcy was not occasioned by an unforeseen calamity, I found that she could fund a meaningful repayment, and that the totality of the circumstances weighed in favor of dismissal of her case. *Id.*

In each of those cases, the debtors had stable income that was slightly above median. In the instant case, Debtor has an income well above the median and expenses that he refuses to reduce. I find that the only reason Debtor's schedules reveal no significant disposable income is because his schedules do not accurately reflect his actual monthly income and he refuses to reduce his expenses. He has a stable, above median income, he has more income than is revealed on his schedules, is eligible for Chapter 11 relief, has refused to reduce his extravagant expenses, could provide a meaningful distribution in a Chapter 11, and purchased a new car very shortly before filing the petition. While these factors are not weighed formulaically against the factors that favor non-dismissal, I find the totality of the circumstances to warrant dismissal in the instant case.

Because the totality of the circumstances warrant dismissal, I need not address the Trustee's contention that this Chapter 7 should be dismissed for bad faith, pursuant to 11 U.S.C. § 707(b)(3)(A).

### *ORDER*

The United States Trustee's Motion to Dismiss Pursuant to 707(b) is therefore GRANTED.