**In The Matter of William James McKAY, III, Cherise Michelle McKay, Debtors.**

No. 09–41491.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Nov. 30, 2010.

Richard C. E. Jennings, Law Offices of Skip Jennings, PC, Savannah, GA, for Debtors.

James L. Drake, Jr., Savannah, GA, trustee.

### ORDER ON UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS

LAMAR W. DAVIS, JR., Bankruptcy Judge.

The trial of the above-captioned case was conducted on September 14, 2010, and

the Court enters the following Findings of Fact and Conclusions of Law based on the stipulations of the parties, the evidence introduced at trial, and applicable authority.

### FINDINGS OF FACT

The United States Trustee contends that the case is subject to dismissal under § 707(b)(1) and (b)(3) because Mr. McKay earns $120,000.00 per year, has a stable job, is eligible for Chapter 13, owns an expensive home and two expensive vehicles, and other budgetary factors which suggest that Debtors' Chapter 7 case is abusive under the totality of circumstances.

Debtors' counsel contends that Debtors were victims of an economic calamity. Real estate prices in this country collapsed at a time when Debtors were in the midst of relocating from Little Rock, Arkansas, to Savannah, Georgia, and during which time Debtors were marketing their Little Rock home and purchasing a new home in anticipation of Mr. McKay going to work for the Savannah Convention and Visitors Bureau. Debtors take issue with the United States Trustee's contention that devoting over 80% of their net income to housing and vehicle costs is a compelling factor in favoring dismissal of the case. Debtors contend that their budget is very tight; that there are no luxuries, club memberships, or similar expenditures; that the Court should not impose on the Debtors a duty to move out of a home which they have purchased in good faith; and that § 707 was never intended to impose such an obligation on debtors. Debtors' child attends public school. They attempted to negotiate with their creditors and, but for the inability to sell their Little Rock home, they never would have gotten into their current position.

The parties' stipulations entered into in this case are reproduced herein *verbatim:*

1. The debtors, Mr. and Mrs. McKay, are a married couple with an eleven-year-old son, resulting in a household of three persons. Mr. McKay is 50 years old and in good health. Mrs. McKay is 41 years old and in good health. The debtors' son is also in good health.

2. Mr. McKay is Vice President of Sales at the Savannah Convention and Visitors Bureau, where he has worked since April 2006. Initially, Mr. McKay's gross salary was approximately $110,000.00 per year exclusive of bonuses. Currently, Mr. McKay earns a gross annual salary of $120,532.10 exclusive of bonuses.

3. Mrs. McKay is a homemaker. She does not work outside the debtors' home and earns no income. The debtors' son attends Charles Ellis public elementary school in Savannah.

4. In the summer of 2004 after Mr. McKay accepted a job offer, the debtors sold a home in Tennessee and moved to an apartment in Little Rock, Arkansas. The rent on the apartment was $985.00 per month. The debtors kept some of their furniture in storage.

5. When he started his job in Little Rock, Mr. McKay's gross salary was $98,000.00 per year.

6. The debtors borrowed $560,000.00 for a construction loan to build a new house in Little Rock, Arkansas. Construction was completed and the debtors moved into the new Little Rock home in November 2005.

7. The construction loan was converted into two mortgages—a first position mortgage and a second position mortgage. The payment on the first position mortgage was $4,300.00 and the payment on the second position mortgage was $500.00.

8. In April of 2006, Mr. McKay accepted the job as Vice President of Sales at the Savannah Convention and Visitors Bureau. That same month, the debtors placed their Little Rock home on the market for sale. The appraised value of the home was $750,000.00. The list price for the home was $715,000.00 when it originally went on the market.

9. The debtors' realtors in Little Rock told the debtors that the Little Rock home would likely be sold within five or six months of placing it on the market.

10. Mr. McKay began working for the Savannah Convention and Visitors Bureau in April 2006. By agreement, Mr. McKay lived in various Savannah hotels free of charge while he looked for housing in Savannah.

11. On or about July 14, 2006, the debtors closed the purchase of their home at 310 Washington Avenue in Savannah. The purchase price was $570,000.00. They financed the purchase with a first and second mortgage against the property.

12. On July 24, 2006, the debtors traded their 2003 Chevy Venture to purchase a new 2006 Hummer H3. The debt against the trade-in vehicle exceeded its value, thus resulting in negative equity toward the purchase of the Hummer H3. The total cost of the transaction, after factoring in the negative equity, was $46,497.00. The monthly payment on the Hummer H3 is $744.00, and the vehicle loan will be paid off in mid 2012.

13. The debtors moved into their Savannah home in August 2006. At the time they moved into the Savannah home, the debtors had not received any offers to purchase their Little Rock home.

14. The debtors understood that their monthly income was insufficient to make four mortgage payments on two homes at the time they purchased the Savannah home. To aid in carrying the mortgages on both homes, the debtors obtained a home equity line of credit from Regions Bank as part of the closing on the Savannah home. The amount of the line of credit was based on the appraised equity in the Little Rock home.

15. Regions bank paid off the existing second mortgage on the Little Rock home and extended additional credit to the debtors based on the difference between the outstanding debt against the Little Rock home and the home's $750,000.00 appraised value.

16. The debtors used their income from Mr. McKay's employment at the Savannah Convention and Visitors Bureau to make the payments on the Little Rock home. The debtors drew from the home equity line of credit at Regions Bank to make the mortgage payments on the Savannah home.

17. Ultimately, the debtors were never able to sell the Little Rock home. The home equity line of credit from Regions Bank was exhausted approximately one year after they moved to Savannah.

18. On March 24, 2008, the debtors traded their 2001 Ford Excursion to purchase a 2006 Hummer H2. The dealer applied $4,114.50 in net equity from the trade-in vehicle toward the purchase price of $42,211.40. The financing contract required 72 monthly payments of $688.03 beginning May 8, 2008.

19. The debtors' credit card accounts were frozen in the summer of 2008.

20. The debtors stopped making mortgage payments on the Little Rock home in the summer of 2008.

21. In the fall of 2008, the debtors contacted a local attorney in Savannah, who referred them to Mr. Jennings.

22. The Little Rock home was lost to foreclosure in March 2009.

23. The debtors filed their voluntary chapter 7 bankruptcy petition on July 14, 2009.

24. The debts at issue in this case are primarily consumer debts.

In 2004 Mr. McKay was employed in Little Rock, Arkansas, earning just under $100,000.00 per year in a position which he expected to be permanent. In November of 2005 he entered into a contract to build a home in a new development and expected to invest approximately $560,000.00 in the home (the "Little Rock House"). He was unexpectedly forced out of his job in the spring of 2006 due a to change in leadership of the organization. As a result, Mr. McKay found his current position with the Savannah Convention and Visitors Bureau. At the time of this change he consulted with real estate professionals in the Little Rock area who expected that he could sell his home there in a relatively short time, and they recommended a listing price of $715,000.00.

Mr. McKay came to Savannah and lived in temporary housing at the expense of his new employer while he looked for a home. He ultimately purchased a home in July of 2006 (the "Savannah House"). At that time he had had no offers on the Little Rock House, but was assured by Little Rock realtors that the market remained good and that he could expect to sell the home within a reasonable time. Ultimately, no offers were forthcoming, driven in part by the nationwide economic downturn and by the specific market conditions in the Little Rock area. There, a wave of unemployment occurred when Alltel purchased Verizon and many jobs were eliminated. As a result, the real estate market was flooded and Debtors were unable to sell the Little Rock House.

Because the Little Rock House appraised for more than the mortgage that it secured, Debtors took out an equity line of credit against it. This line of credit was secured by a second mortgage on the Little Rock House, made in conjunction with Debtors' closing on the Savannah House. Debtors made draws against that equity line to assist them in meeting their bills, including the payment of the first mortgage. *See* Stipulations 14–16. Using this loan and the salary from his Savannah job Mr. McKay was able to maintain his payments for some time. But by the summer of 2007 his home equity line was exhausted and he borrowed money from friends and family to continue payments into 2008. Meanwhile his realtors in Arkansas recommended, and he agreed to, periodic reductions in the asking price of the Little Rock House. Eventually the asking price was reduced to $630,000.00, but despite all their efforts, Debtors never had a single offer on the Little Rock House.

Ultimately in the fall of 2008 Debtors stopped making payments on the Little Rock House and the lender foreclosed on it in 2009. The proceeds of that foreclosure sale were applied to the first mortgage on the Little Rock House. However, the Regions Bank second mortgage on the Little Rock House was left with a balance of $174,000.00. Debtors purchased two Hummers, one in 2006 to replace a 2003 minivan and one in 2008 to replace a 2001 Ford Excursion which was having mechanical problems. The purchase of the second vehicle was at a time when Debtors were clearly in financial distress. The United States Trustee contends that the Debtors should vacate their home, move to an apartment, dispose of one or both vehicles, and get something smaller and less expensive to operate in order to fund a Chapter 13 plan.

## CONCLUSIONS OF LAW

■ The United States Trustee has stipulated that there is no presumption of abuse pursuant to 11 U.S.C. § 707(b)(2). *Motion to Dismiss,* Dckt. No. 20, ¶ 3. The United States Trustee has moved for dismissal pursuant to 11 U.S.C. § 707(b)(3) and contends that the totality of the circumstances demonstrates abuse of the Bankruptcy Code, and alternatively, that Debtors have abused the Bankruptcy Code by filing the petition in bad faith. *Id.* The United States Trustee bears the burden of proving to this Court that the totality of the circumstances of Debtors' filing demonstrates abuse of the Bankruptcy Code. *In re Walker,* 383 B.R. 830, 836 (Bankr. N.D.Ga.2008).

*Abuse*

11 U.S.C. § 707(b)(1) provides that this Court may dismiss Debtors' case if granting relief would be an abuse of the Bankruptcy Code. Section 707(b)(3) directs this Court what to consider in determining whether such abuse has occurred. I may find abuse of the Bankruptcy Code if I find that Debtors have filed the case in bad faith or if the totality of circumstances demonstrates abuse. Both issues have been raised by the United States Trustee. While it is easy to lose sight of the forest for the trees, I reiterate that the ultimate focus must remain on the concept of abuse.

■ Under established precedent, bad faith is demonstrated by "concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *In re Zick,* 931 F.2d 1124, 1129 (6th Cir.1991); *In re Hibbard,* 448 B.R. 296 (Bankr.S.D.Ga.2009) (Davis, J.) (quoting *Zick* ). However, Congress recognized that established "bad faith" precedent might be inadequate to cover all instances of conduct which it perceived to be abusive, and in 2005 granted bankruptcy courts new authority to dismiss cases for conduct equally objectionable but factually dissimilar from the traditional bad faith line of cases. First, Congress established a means test in § 707(b)(2) to weed out Chapter 7 debtors who had ability to repay debts and were not "honest but unfortunate." That long honored formulation enunciates what constitutes a debtor deserving of the "fresh start" the Bankruptcy Code provides. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Second, Congress added a "totality of the circumstances" standard for finding abusive conduct outside the usual bad faith parameters. 11 U.S.C. § 707(b)(3)(B). While there is a confusing overlap of factors among the three bases for dismissal (presumptive abuse, bad faith, and totality of circumstances), a finding of abuse remains the lodestar. I find that to merit dismissal, a holistic view of Debtors' behavior must reveal conduct of similar seriousness under a "totality of circumstances" analysis as has always warranted dismissal under a "bad faith" analysis.

■ Abuse is "[a] departure from legal or reasonable use." BLACK'S LAW DICTIONARY p. 10 (8th ed. 2004). However, like much of the law, that sanitized definition captures merely a clinical meaning of "abuse." Abuse is also "a corrupt practice or custom" and "a deceitful act." *Webster's Third New International Dictionary,* p. 8 (1986). Lastly, abuse is a "wrong, often corrupt use," synonymous with misapplication, misappropriation, misemployment, mishandling, misuse, and perversion. *Roget's II, The New Thesaurus,* p. 6 (1988). It is this corrupt, deceitful, perversion of the Bankruptcy Code— the nuts and bolts of abuse—that must be

proven for a dismissal under § 707(b)(1) and (b)(3). *See Hibbard,* 448 B.R. at 300 ("[I]t is correct to say that the ultimate conclusion in these cases depends on whether a debtor passes the 'smell test' after consideration of all the factors. That is, upon consideration of those factors, is a bankruptcy court left with the conviction that the debtors have ... abused the bankruptcy process?")

*Totality of the Circumstances*

■ The United States Trustee first alleges that the totality of Debtors' financial circumstances demonstrates abuse. 11 U.S.C. § 707(b)(3)(B). As I have held in the past, the "totality of the circumstances" test provided in 11 U.S.C. § 707(b)(3)(B) requires me to "consider all of the circumstances, in their totality, to discern any abuse of the bankruptcy process." *In re Truax,* 446 B.R. 638 (Bankr. S.D.Ga.2010) (Davis, J.). In the past, I have applied the eight factor test as laid out in *Truax.* I take this opportunity, however, to stress what I have said many times in the past: The test is one of "totality of the circumstances," not a mathematical application of the checklist. The eight factors discussed in *Truax* are non-exclusive and are indicative of the types of circumstances considered by this Court. Congress certainly knows how to make a mathematical formula for application in bankruptcy, and seeing none in 707(b)(1) or (b)(3), this Court refuses to apply the factors in a mathematical way. As I am directed by the Code, I will—as always— assess the "totality of the circumstances" holistically, not simply mechanically run down a checklist.

*Ability to Pay*

■ It is true that the most important factor is "whether a debtor has the ability to repay a meaningful portion of his debts from future income" in a Chapter 13 plan. *In re James,* 414 B.R. 901, 914 (Bankr.S.D.Ga.2008) (Davis, J.); *Truax,* 446 B.R. 638 (quoting *James* ). However, this is not the only factor. "To determine that a case was not filed in good faith solely on the basis of debtor's ability to pay even though the means test concludes otherwise would be to invent a new means test, different than the uniform standard enacted by Congress...." 6 COLLIER ON BANKRUPTCY ¶ 707.04[3][b], p. 707–43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). For the reasons stated below, I find that the United States Trustee has not carried his burden on this factor, and that accordingly, Debtors cannot repay a meaningful portion of their debts from their future income.

This is true under either of two possible scenarios. If, as suggested by the United States Trustee, the Debtors surrender their house and vehicles (all of which are undersecured), the new unsecured portions of the claims would render them ineligible for Chapter 13. Those unsecured claims would total at least $412,868.32 [1] and the statutory maximum unsecured claims allowed in a Chapter 13 is $360,475.00. 11 U.S.C. § 109(e). Debtor would therefore be ineligible for Chapter 13, and I find that the administrative costs of Chapter 11 make conversion of this case to a Chapter 11 impracticable.

The alternative result is that Debtors keep their home and vehicles and pay an

---

1. $75,014.30 for credit cards and utilities (Exhibit A, pp. 18–19), $13,000.00 for the vehicles (Exhibit A, p. 16), $173,526.09 for the deficiency on the second mortgage on the Little Rock House (Exhibit O, loan 0431), $151,327.93 for the deficiency on the second mortgage on the Savannah House (Exhibit O, loan 0471), and some unknown deficiency for the first mortgage on the Little Rock House.

unsecured distribution that would not be "meaningful." *See Truax,* 446 B.R. at 642. Debtors submitted a Hypothetical Chapter 13 Plan to support this position. Exhibit D. Without delving into the specifics of the Hypothetical Chapter 13 Plan, suffice it to say that Debtors' numbers as presented do not support a finding that they could provide a meaningful dividend in Chapter 13. Unsurprisingly, the United States Trustee takes exception to this and challenges Debtors' figures. Among the United States Trustee's challenges to the Hypothetical Chapter 13 Plan is the fact that the Debtors expect to receive more than $13,000.00 in income tax refunds this year. The United States Trustee suggests that Debtors' income be adjusted to reflect this amount.

The United States Trustee further suggests that Debtors' housing and vehicle expenses are inordinately high, and if decreased, Debtors could fund a Chapter 13. However, Debtors' schedules and Hypothetical Chapter 13 Plan appear to contain uncommonly low monthly expenses on everything else. Debtors suggested that if this Court adjusted Debtors' income to reflect additional revenue, this Court should also consider additional expenses:

> [T]he UST's arguments regarding disposable income ignore the fact that Debtors' Schedule J shows what can only be described as a "bare bones" budget. Unlike in the *Truax* case, the McKays do not and did not lead a lavish lifestyle. Their son goes to public school. There are no entries on Schedule J for Home Maintenance, Clothing, Medical & Dental Expenses or Recreation. The entry for Transportation (which is intended to include not only the cost of gasoline, but also for service of the Debtors' vehicles) is set at only $150.00 per month. Food for a family of three is set at only $250.00 per month. To the extent that the Debtors should

revise their Schedule I to list their possible tax refunds, they should also be entitled to revise their Schedule J to "flesh out" their expenses in a more realistic manner.

*Brief,* Dckt. No. 72, p. 3. I agree. However, although desirable, no "fleshed out" budget is mandatory. If Debtors desire to sacrifice in some areas in order to keep their house, such tradeoffs are allowable in bankruptcy. "Congress clearly intended that a debtor might spend more than the [IRS Standard] for one category (e.g., rent) and less for another (e.g., food)," as long as the end result did not leave substantial disposable income. 6 COLLIER ON BANKRUPTCY ¶ 707.04[3][b], p. 707–44 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (discussing § 707(b)(3) in terms of requiring more than ability to pay, which is covered by § 707(b)(2)).

Debtors could and should have affirmatively demonstrated this trade-off by filing an amended budget. However, no amended budget was filed despite the fact that the expenses on their budget were projected as of the filing date of the case, eighteen months ago. Debtors would have been entitled to amend these expenses to be more realistic and current. *In re Dowleyne,* 400 B.R. 840, 846 (Bankr.M.D.Fla. 2008) ("Post-petition pre-discharge events are relevant to a Section 707(b)(3)(B) analysis."); *In re Lavin,* 424 B.R. 558, 563 (Bankr.M.D.Fla.2010) ("[P]ost-petition events are relevant, so that the court can examine changes in a debtor's predischarge financial situation in reaching its decision.").

Despite the fact that no amended budget was filed, I find that Debtors' expenses, projected eighteen months ago, are not dispositive. The United States Trustee has the burden of proving abuse and has not established what Debtors' cur-

rent expenses actually are, only what their current income is. The United States Trustee has cherry-picked Debtors' high income, tax refund, and high housing expense, and has pointed to these three things as "proof" that Debtor has the ability to pay. The United States Trustee has not, however, demonstrated to this court that Debtors' actual overall current expenses are indicative of an ability to pay. In the absence of affirmative proof on the expense side, I hold that the United States Trustee has failed to carry its burden.

*Other Factors*

█ In retrospect we know that the housing bubble, at the time of Debtors' move to Savannah in 2006, was on the verge of imploding. Unbeknownst to Debtors, their Little Rock House was about to lose substantial value over the coming months. However, Debtors consulted professional real estate agents, and on those recommendations decided to buy another house in Savannah. It was this decision to temporarily over-extend themselves that ultimately caused Debtors to file bankruptcy. In *In re Ziegler*, 2009 WL 5943248 (Bankr.D.Colo.) the debtors purchased a house that they could not afford and hoped the value of the house would go up, intending to refinance within three months. When the value of the home did not go up, the debtors were forced to file bankruptcy, and the court held that "a sudden calamity is an event beyond a debtor's control. [In *Ziegler*], the [d]ebtors' decision to purchase a home that was beyond their ability to pay may have been influenced by representations made by their mortgage broker, but it was nevertheless a decision within their control." *Id.* at *2.

In the instant case, while it now seems clear in 2010 that trying to carry the debt on two houses in 2006 was a bad idea, at the time it was not unreasonable. Debtors were told by their realtors that the Little Rock house would sell quickly, they were able to get both a first and second mortgage on the Savannah House, and Regions Bank was willing to lend them not only enough to close on the Savannah House, but also an additional $174,000.00 on the perceived equity in the Little Rock House. Debtors were not the only ones who believed that their decisions were reasonable; they were advised on the issue by realtors and bankers. The market crashed, Debtors were left holding two high-end houses, and they were unable to keep them both. This situation is different from the case in *Zeigler*, where debtors simply hoped the value of their house would increase. This may not be a textbook unforeseen calamity, but the collapse of the national housing market, exacerbated by even worse conditions in Little Rock, was unforeseeable as to timing and severity and does not support a finding of abuse.

Debtors made an effort to negotiate with their creditors, asking them to waive the fees and decrease the interest so that Debtors could stay current. No creditors opted to work with Debtors on these requests. Accordingly, Debtors' attempt to negotiate a non-bankruptcy agreement does not support a finding of abuse.

Debtors incurred the debts in this case over an extended period. Much of the credit card debt was incurred as early as January of 2006, during the building of the Little Rock House. Exhibit R. The American Express Blue debt began with a balance transfer in April of 2006 and grew slightly every month. Exhibit Q. The American Express Platinum debt began no later than January of 2006. Exhibit P. The Chase credit card had a balance of $15,637.07 as early as July of 2007. Exhibit S. Accordingly, the period of time when debts were incurred supports a finding of no abuse.

Debtors closed on the Savannah House in July of 2006. *Stipulations,* ¶ 11. That same month they acquired the Hummer H3. *Id.* at ¶ 12. All of these debts were incurred far in advance of the filing of the petition. However, in March of 2008 Debtors acquired a used 2006 Hummer H2 vehicle. *Id.* at ¶ 18. At this time—fifteen months before the petition was filed—Debtors should have realized that they were in financial trouble. This purchase, however, only raised Debtors' payment by $78.00 per month, and it provided a more reliable vehicle with a lower overall cost of operation. *Brief in Support of Dismissal,* Dckt. No. 71, p. 13. There was no evidence of Debtors giving false information to obtain the loan or other evidence of misconduct. I do not find that the purchase indicates an abuse of the bankruptcy system.

Debtors have a stable future income. This fact supports a finding of abuse.

Debtors cannot realistically reduce any expenses other than housing and vehicle expenses. In fact, as I found above, their other reported expenses appear unrealistically low. While the United States Trustee asks this Court to effectively evict Debtors from their house, repossess their vehicles, and tell them where to live and what to drive, this Court is disinclined to do so. While Debtors' housing costs are more than four times the Internal Revenue Service Bankruptcy Allowable Living Expenses, those numbers are only binding in the mechanical means test analysis. Bankruptcy Allowable Living Expenses, UNITED STATES TRUSTEE PROGRAM, http://www.justice.gov/ust/eo/bapcpa/20090315/bci_data/housing_charts/irs_housing_charts_GA.htm (last visited November 10, 2010). As I have noted above, in a § 707(b)(3) context those numbers only provide a baseline to help this Court understand the playing field.

Abuse in the § 707(b) context has been found where debtors fund an extravagant lifestyle at the expense of payments to the unsecured creditors. *In re Truax,* 446 B.R. at 644 (Debtor paid $1,000.00 per month for recreation, $322.99 per month for a Jeep for his teenage son, $1,000.00 per month on private school expenses, $1,300.00 per month on food costs, and $500.00 per month on transportation costs); *In re Tropper,* No. 09–76151 slip op. at 5 (Bankr.N.D.Ga. July 19, 2010) (Drake, J.) (Debtors paid $872.36 for recreation, $897.07 per month on education, $1,460.00 per month for food, and $450.85 per month for clothing); *In re Ricci,* 2009 WL 3381517 (Bankr.M.D.Fla.2009) (Debtors spent $885.00 per month on utilities, phones, and internet; $1,000.00 on food and clothing; and $330.00 on transportation, recreation, and charitable contributions). These Debtors' situation does not mirror those cases.

In light of previous precedent I should elaborate further. Debtors' housing expense of four times the Internal Revenue Service Standard is well below the "shocking" level present in *Truax.* *See Truax,* 446 B.R. at 643–44. Equally significant, in *Truax* there were substantial other indicia of abuse. In *Truax,* the debtor scheduled (among other things) $1,000.00 per month on recreation, $1,000.00 per month on private school, $1,300.00 per month on food, and $322.99 per month on a new car for his teenage son. *Id.* While some courts have found that housing costs four times the Internal Revenue Service Standard support a finding of abuse, those cases are also replete with debtors' failure to abate spending on other items.

In *In re Tropper,* the court found that the debtors' housing expense—which was almost four times the Internal Revenue Service Standard for housing and utilities—was unreasonable. No. 09–76151 slip

op. However, in *Tropper,* the debtors also scheduled $872.36 for recreation, $897.07 per month on education, $1,460.00 per month for food, and $450.85 per month for clothing. *Id.* at 5. The case *sub judice* has none of these other extravagant expenses.

Similarly, in *In re Durczynski,* the court found that the debtors' housing expense—which was two and a half times the amount allowed under the means test of § 707(b)(2)—was excessive. 405 B.R. 880, 884 (Bankr.N.D.Ohio 2009). However, the debtors in *Durczynski* also scheduled $1,150.00 per month in food expenses, claimed pool upkeep expenses as necessary, and had equity in the residence. The case *sub judice* is different in all these respects.

Finally, in *In re Keller,* the court held that a housing expense of more than five times the IRS Standards was excessive. No. 09–21519, slip op. at p. 9, 2010 WL 4386850 (Bankr.S.D.Ga. Sep. 2, 2010) (Dalis, J.). However, in that case the bankruptcy was not caused by a calamity and the debtor testified to the following expenses: $200.00 per month for cell phones, $1,500.00 to $1,700.00 for food and clothing, $50.00 to $100.00 for recreation, and $200.00 to $300.00 for unreimbursed work-related costs. *Id.* at pp. 4–5. The court held that the debtor could reduce her expenses, including food and clothing expenses, without depriving her family of any necessities. *Id.* at p. 13. The case *sub judice* differs from *Keller* in those respects.

I am not setting a per se rule that mortgage payments four times the Internal Revenue Service Standard would never support a finding of abuse. However, this Court takes debtors as they come, with their associated debts. If Debtors always made the right decision they would not be in this Court. In the instant case, Debtors moved to this area from out of state, bought the Savannah House, which they thought was well within their means, tried to sell the Little Rock House, and got caught holding them both. In hindsight, the decision to buy the Savannah House before the Little Rock House was sold was not perfect, but Debtors have not attempted to abuse the bankruptcy process through lavish spending and evasion of payments or through any lack of integrity in dealing with their creditors. Instead, Debtors are holding assets that they cannot replace with their destroyed credit, and that would not add to the estate if they were liquidated.

A review of all of Debtors' circumstances convinces me that Debtors have not sought to abuse the bankruptcy process.

*Bad Faith*

11 U.S.C. § 707(b)(3)(A) requires me to consider whether Debtors abused the bankruptcy system by filing the petition in bad faith. Once the United States Trustee put Debtors' good faith at issue, the burden shifted to Debtors to establish their good faith. *In re Smith,* 229 B.R. 895, 897 (Bankr.S.D.Ga.1997). The United States Trustee's brief points out that "[g]ood faith must be determined on a case-by-case basis considering whether the provisions, purpose or spirit of the bankruptcy laws have been abused." *Id.* As I discussed above, Debtors' Hypothetical Chapter 13 would yield a minimal payment and the administrative costs of Chapter 11 make conversion of this case to a Chapter 11 impracticable. All the factors discussed above are relevant to a bad faith analysis. Suffice it to say that there are no indicia of bad faith present in this case. *In re Ricci,* 2009 WL 3381517, *9 (Bankr. M.D.Fla.2009) ("Bad faith is determined on a case by case basis through the analysis of circumstantial factors considered to be indicia of bad faith."). Debtors are not

guilty of concealment, fraud on their creditors, deceit, corruption, or perversion of the bankruptcy process, and have now affirmed the majority of their debt. Accordingly, I find that Debtors did not file this petition in bad faith.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the United States Trustee's Motion to Convert or Dismiss is DENIED.