**In the matter of Kenneth R. HARDIGAN, Debtor.**

No. 12–40484.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

March 29, 2013.

Mark A. Bandy, Law Office of Mark A. Bandy PC, Savannah, GA, for Benjamin R. Roach, Trustee.

Mark Bulovic, Bulovic Law Firm, LLC, Catherine M. Palumbo, McCorkle & Johnson, LLP, Savannah, GA, for Debtor.

Joel Paschke, Office of U.S. Trustee, Savannah, GA, for US Trustee.

## OPINION AND ORDER ON SUNTRUST BANK'S AND THE UNITED STATES TRUSTEE'S MOTIONS TO CONVERT OR DISMISS

LAMAR W. DAVIS, JR., Bankruptcy Judge.

Debtor filed his Chapter 7 case on March 7, 2012. On May 17, 2012, SunTrust Bank ("STB"), a creditor in the case, filed a Motion to Convert to Chapter 11 or,

in the Alternative, to Dismiss ("STB's Motion to Convert or Dismiss"). Dckt. No. 28.[1] The United States Trustee (the "UST") also filed a Motion to Convert to Chapter 11, or in the Alternative, to Dismiss Case ("UST's Motion to Convert or Dismiss") on May 23, 2012. Dckt. No. 36. After discovery, both STB and the UST filed Motions for Summary Judgment, which were denied. The Order denying STB's Motion for Summary Judgment was entered on December 19, 2012. Dckt. No. 110. The Order denying the UST's Motion for Summary Judgment was entered on December 20, 2012. Dckt. No. 111. In the Order denying the UST's Motion for Summary Judgment, the Court held that Debtor "passed" the Means Test. *Id.* Accordingly, the presumption of abuse does not arise in this case under 11 U.S.C. § 707(b)(2).

The remaining issues raised by both Motions to Convert or Dismiss under 11 U.S.C. §§ 707(b)(3) and 706 were tried on January 25, 2013. Based on the stipulations of the parties, the evidence introduced at trial, and the record in this matter, the Court now enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor is a sixty-year-old cardiologist. On the petition date, Debtor resided in a home located at 1 W. Bluff Drive in Savannah, Georgia (the "Bluff Drive Property"). This home was purchased in 2006 for $1,725,000.00 by One Bluff Drive LLC ("OBD"), a company of which Debtor is the sole owner, member, and manager. *Statement of Facts Not in Dispute,* Dckt. No. 87 at ¶¶ 49–51. The purchase of the Bluff Drive Property was financed by Sun-

---

1. For this Order, citations to the main bankruptcy case [12–40484] will appear as "Dckt. No. ____"; citations to K.A.P., Inc.'s Adversary Proceeding [12–4069] will appear as "A.P. Dckt. No. ____".

Trust Mortgage ("STM"). *Id.* at ¶¶ 52–53. In December 2006, OBD conveyed an undivided 1% interest in the Bluff Drive Property to Debtor. *Id.* at ¶ 54. Debtor continued to pay STM, the first priority mortgage holder on the property, up through February 2012, and continued to pay utilities for the property even after he moved out. *Id.* at ¶ 70; *Debtor's Brief,* Dckt. No. 124 at 7. Debtor moved out of the home in June 2012, and Debtor's home has now been surrendered and foreclosed upon. *Statement of Facts Not in Dispute,* Dckt. No. 87 at ¶ 67. Debtor's current monthly rent is $1,250.00. *Id.* at ¶ 68.

Prior to the petition, Debtor also owned two investment rental and vacation properties in Colorado. STB held the mortgages on these properties, and the mortgages were cross-collateralized by the Bluff Drive Property. The first Colorado property was sold after about a year, but Debtor kept the second property until, at STB's urging, Debtor sold the property in 2010 for $2,300,000.00.[2] The STB mortgage on the property was paid off in its entirety from the sale, but Debtor testified that this sale amount was approximately $2,000,000.00 less than what the property had appraised for the summer before.

Debtor is currently employed as a principal in a local cardiology practice, Savannah Cardiology, PC. *Statement of Facts Not in Dispute,* Dckt. No. 87 at ¶ 71. He formerly earned a substantial additional salary as a contract cardiologist providing coverage at Meadows Regional Medical Center in Vidalia, Georgia, approximately 100 miles from the location of his principal practice in Savannah. *Debtor's Exh.* 14. He took on this job of seventy hours per month, in addition to his full-time medical practice, to attempt to deal with the finan-

cial difficulties that led to the filing of this case. That contract terminated in 2012. Debtor's Exh. 16. Because his principal practice already consumes 70–80 hours per week, Debtor has not attempted to replace the income derived from this outside work which, because of his exhausting regular schedule, is not reasonable to continue indefinitely.

While his 2011 and 2012 earnings showed substantially higher income as a product of this part-time work with Meadows Regional, the Debtor's income from Savannah Cardiology is the relevant income for the pending motion. In 2011, Debtor grossed $422,000.00 and netted $196,000.00 from that practice. Movant's Exh. 12. In 2012, his gross was $519,000.00 and his net was $201,000.00. Debtor's Exh. 13. At trial, Debtor testified that pending adjustments in Medicare and Medicaid could potentially further decrease his salary. Recent cuts have already caused Debtor's net income from his cardiology practice to decline by approximately 20%.

Debtor has three adult sons. His wife passed away in 2004, and so Debtor's household size is one. On the petition date, Debtor owned five automobiles free and clear of liens, three of which were not in working condition. *Statement of Facts Not in Dispute,* Dckt. No. 87 at ¶¶ 85–86. One vehicle was sold for scrap and the proceeds of that sale went to the Chapter 7 Trustee. *Id.* at ¶ 89. Debtor currently drives a thirteen-year-old Mercedes, and Debtor's sons have two of the vehicles. *Id.* at ¶¶ 87–88. Debtor maintains several term life insurance policies for the benefit of his sons. *Id.* at ¶ 82. The aggregate death benefit on the Debtor's term-life in-

---

**2.** Except where the precise number is material, I will utilize rounded or approximate numbers throughout this opinion.

surance polices is approximately $9,000,000.00, and Debtor claimed a deduction of $1,160.00 per month on his amended means test for the premiums associated with these policies. *Id.* at ¶ 83; Dckt. No. 39.

Debtor's major debts at filing were $1,700,000.00 to STM for his residence, a $905,000.00 construction loan from STB for a renovation to his residence, and a $875,000.00 disputed claim by K.A.P., Inc. ("K.A.P.") for unpaid cost overruns on the renovation project. These debts were evidenced in Debtor's schedules, which he filed with his petition and later amended on June 7, 2012. Dckt. Nos. 1 and 39. The amendments to Debtor's schedules showed a reduced value of his real estate collateral (from $1,740,000.00 to $1,500,000.00), an increased amount of disputed liability to K.A.P. (from $550,000.00 to K.A.P.'s current claim of $875,524.35), and an increased amount of unsecured nonpriority debt, largely based on guaranty obligations to STB. *Id.; see also* Movant's Exh. 8. Debtor also amended his schedules to show that his debts were primarily consumer in nature and removed from Schedule J the monthly payment amount for the second mortgage on Debtor's residence. Dckt. No. 39.

Debtor's home has been foreclosed on, and so the potential unsecured claim on the STM loan is $200,000.00. Thus, his maximum exposure for unsecured claims by STM, STB, and K.A.P. is approximately $2,000,000.00. He also personally guaranteed $6,200,000.00 for STB loans to Savannah Cardiology. Movant's Exh. 8, Dckt. No. 39 at 9–10. However, his personal liability on these claims is capped at ap-proximately 25% of that total or around $1,500,000.00.[3] Movant's Exh. 8.

The renovation project claim originates from a dispute between Debtor and K.A.P., which was hired to do a complete renovation to Debtor's home. After difficulties with plans and specifications supplied at no cost by K.A.P., Debtor engaged his own architect, and K.A.P. provided a base bid for the project of $1,100,000.00 to be funded by STB. Debtor's Exh. 1. Debtor has paid that amount in full and periodic reports from K.A.P. showed the project as 97% complete in October 2008. Debtor's Exh. 6 and 9.

However, in December 2008 K.A.P. billed an additional $276,000.00 (Debtor's Exh. 7), showed a balance due of $234,000.00 in February 2009 (Debtor's Exh. 9), and finally claimed cost overruns due of $314,000.00 in April 2009. Debtor's Exh. 10. These bills were largely undocumented, and Debtor testified that his inquiries into the bases for these overruns went unanswered.

To deal with the potential K.A.P. claim, Debtor had obtained a commitment from STB to advance another $350,000.00. Debtor tried to resolve the dispute until K.A.P. filed a contractor's lien in May 2009 for $544,000.00. Debtor's Exh. 11. When this occurred, Debtor decided not use the advanced $350,000.00 and returned it to STB. Both K.A.P. and STB sued Debtor. On the eve of trial, K.A.P. and Debtor entered into a week-long mediation with the assistance of the presiding Superior Court Judge. A settlement amount of $200,000.00 was determined, but any settlement was contingent on a feasible settlement with STB, and Debtor's negotiations with STB were unsuccessful.

**3.** Debtor testified that at one time he was jointly and severally liable on certain of these obligations, but that they were later amended to reduce individual exposure to liability.

STB filed four proofs of claim in this case for these guaranties and attached the personal guaranty documents that show Debtor's capped liability. Movant's Exh. 8.

*Statement of Facts Not in Dispute*, Dckt. No. 87 at ¶¶ 115, 116. Debtor ultimately paid $85,000.00 to K.A.P. when his review of the records showed this amount to be attributable to added costs he was advised about before the work was done.

Debtor filed his bankruptcy case a week after this mediation. Prior to the petition, Debtor had incurred $161,125.52 in legal fees and expenses defending the K.A.P. and STB claims. Dckt. No. 130. As of February 4, 2013, Debtor had incurred $176,212.18 in legal fees and expenses in connection with that litigation. *Id.* K.A.P. initiated an Adversary Proceeding (No. 12–4069) against Debtor on October 17, 2012, asserting that its claim is non-dischargeable. Dckt. No. 80. This Court has allowed K.A.P. and Debtor to go forward with their state court litigation to determine the amount, if any, of Debtor's liability to K.A.P. for the renovation project, but has retained jurisdiction on the issue of dischargeability of K.A.P.'s claim under 11 U.S.C. § 523(a). A.P. Dckt. No. 13. At the hearing, the Court estimated K.A.P.'s claim to be $115,000.00.

Movants and Debtor entered into a Statement of Facts Not in Dispute, which was filed with the Court on October 30, 2012. *Statement of Facts Not in Dispute.* Dckt. No. 87. The Court adopts the parties' stipulations numbered 1–117 in full and incorporates this document by reference into this Order.

At trial, the parties agreed to the following additional stipulations:

(1) Claims 5, 6, 7, and 8 are claims of STB;

(2) Debtor's budget expense (Movant's Exh. 4–A, Dckt. No. 82, Line 13c)

of $6,608.33 per month is a post-salary deduction for debt owed to LMC Funding.[4]

(3) Movant's Exhibit 4–A, dated September 9, 2012, shows disposable monthly income of $9,897.44 after Debtor's medical group deducts his pro-rata share of debt service on personal guaranties to STB and after the additional $6,608.33 per month is paid directly to LMC Funding.

(4) Movants do not challenge the propriety of either of the above deductions from Debtor's income.

(5) Movants do challenge the propriety of Debtor's expenditures of some $3,900.00 per month comprised of:

(a) Insurance premium of $1,170.00 per month to purchase a term policy on Debtor's life worth $9,000,000.00 in death benefits to his adult sons;

(b) Bookkeeper expenses of $575.00 per month;

(c) Support of his adult sons for a portion of auto expenses of $600.00 per month and $800.00 per month in direct assistance;

(d) Recreation expenses of $666.00 per month; and

(e) Storage unit expenses of $175.00 per month.

Debtor, STB, and the UST filed post-hearing briefs on February 4, 2013. Dckt. Nos. 124, 126, and 123. In their briefs, each party calculated and presented the Court with a projected payout over five years to unsecured creditors in a hypothetical Chapter 11 case, using various expense and income amounts. Ultimately, Debtor projected a payout of 21.9%, the UST pro-

---

4. Debtor is funding $6,608.33 per month to assist his medical practice or an entity controlled by it in paying a substantial commercial debt, the LMC Funding payment. Debtor is not personally liable for the debt, which is non-consumer in nature, but Debtor has characterized his payment obligation as a condition of employment and that characterization has not been disproved.

jected a payout of 57.7%, and STB projected a payout ranging from 30.71%–47.53%. *Debtor's Brief,* Dckt. No. 124–1: *UST's Brief,* Dckt. No. 126 at 7; *STB's Brief,* Dckt. No. 123, Exh. A. These differences stemmed from various expense reductions and possible income levels of Debtor going forward. The principal difference, however, arose from the parties' calculations of unsecured debt in this case. Both STB and the UST only projected the unsecured claim amount to be approximately $1,200,000.00, while Debtor included his guaranty liability to STB (Claims 5, 6, 7, and 8) to the $1,200,000.00 to arrive at $2,617,912.04 in unsecured claims to be paid out over the life of a Chapter 11 plan. *Id.* The parties projected total disposable income levels available in a Chapter 11 ranging from $375,000.00 to $700,000.00 over sixty months. *Id.*

The Chapter 7 Trustee is currently holding for distribution approximately $185,000.00, which includes Debtor's 2011 tax refund of $137,000.00. *Trustee's Oct. 2012 Interim Report,* Dckt. No. 88; Debtor's Exh. 12. Debtor's 2012 tax refund will likely be around $110,000.00. These tax refund amounts are due to a net operating loss carryforward that will be consumed in 2012 and, going forward, will not shield any of Debtor's income from tax liability. *Debtor's Brief,* Dckt. No. 124 at 3; *see also* Debtor's Exh. 12.

### LEGAL STANDARD

Currently pending before the Court are STB's and the UST's Motions to Convert or Dismiss. Dckt. Nos. 28 and 36. Movants primarily seek conversion or dismissal under 11 U.S.C. § 707(b)(3)(B), but as an initial matter, the Court will analyze their secondary arguments under 11 U.S.C. §§ 707(b)(3)(A) and 706(b).

### Bad Faith under 11 U.S.C. § 707(b)(3)(A)

The UST argues that Debtor's case should be converted or dismissed under § 707(b)(3)(A) because Debtor's case was filed in bad faith. Section 707(b)(3)(A) provides that in considering whether the granting of relief would be an abuse, "the court shall consider whether the debtor filed the petition in bad faith." 11 U.S.C. § 707(b)(3)(A). Once the movant puts the debtor's good faith at issue, the burden shifts to the debtor to establish his good faith. *In re McKay,* 463 B.R. 915, 925 (Bankr.S.D.Ga.2010) (Davis, J.); *In re Smith,* 229 B.R. 895, 897 (Bankr.S.D.Ga. 1997) (Dalis, J.). Good faith must be determined on a case-by-case basis, considering whether the provisions, purpose, or spirit of the bankruptcy laws have been abused. *Smith,* 229 B.R. at 897. Bad faith can be demonstrated by "concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence." *In re Hibbard,* 448 B.R. 296, 300 (Bankr.S.D.Ga.2009) (Davis, J.) (quoting *In re Zick,* 931 F.2d 1124, 1129 (6th Cir. 1991)). Additionally, "bad faith can be established, inter alia, by a debtor's failure to significantly reduce his or her current lifestyle to pay creditors." *Smith,* 229 B.R. at 898.

As support for his contention that Debtor's case was filed in bad faith, the UST asserts that Debtor "misrepresented his monthly expenses, misrepresented his true financial condition, sought to evade means test review by falsely claiming that this case involved primarily non-consumer debt, and disguised rather than disclosed his ability to repay creditors." *UST's Brief,* Dckt. No. 126 at 13. The UST also suggested that Debtor had a retaliatory

motive for his attempt to remain in Chapter 7. *Id.*

I have examined the UST's contentions and find them to be without merit. Debtor's designation that this case involved primarily non-consumer debt is excusable in light of the complexity of his financial affairs. The character of his debt is related to the question of the size of his guaranty liability, which at one time was unlimited and was later capped. He amended his schedules to correct certain errors, and although the schedules were not further amended, no one was misled and all parties were made aware of the capped guaranty liability and Debtor's overall financial circumstances. I find no basis for a bad faith finding from these facts. *See Hibbard,* 448 B.R. at 301 (no finding of bad faith where omissions and errors on schedules were due to an innocent misunderstanding of the information sought or inadequate or sloppy record keeping and reporting). On the contrary, Debtor has exhibited good faith throughout his case by surrendering his home, driving a thirteen-year-old car, negotiating with creditors to avoid bankruptcy, and being cooperative with the Chapter 7 Trustee and other parties.

Therefore, Debtor's case should not be dismissed or converted pursuant to 11 U.S.C. § 707(b)(3)(A) as a bad faith filing.

*Conversion under 11 U.S.C. § 706(b)*

█ Movants seek conversion of Debtor's case to Chapter 11 pursuant to § 706(b) of the Bankruptcy Code, which states: "On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." 11 U.S.C. § 706(b). The burden is on the moving parties to show that the case should be converted. *In re Home Network Builders, Inc.,* 2006 WL 3419791, at *4 (D.N.J. Nov. 22, 2006); *In re Ryan,* 267 B.R. 635, 639 (Bankr.N.D.Iowa 2001).

█ A case may only be converted to Chapter 11 if Debtor may be a debtor under Chapter 11. 11 U.S.C. § 706(d) ("Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter."). The statute fails to delineate any specific grounds for conversion, but a court "'should consider anything relevant that would further the goals of the Bankruptcy Code.'" *In re Gordon,* 465 B.R. 683, 692 (Bankr.N.D.Ga.2012) (quoting *In re Lobera,* 454 B.R. 824, 854 (Bankr.D.N.M.2011)). The Court should also consider whether conversion would "inure to the benefit of all parties in interest," an inquiry that takes into account whether there would be grounds to dismiss the case once it has been converted to Chapter 11 under 11 U.S.C. § 1112(b). *Home Network Builders, Inc.,* 2006 WL 3419791, at *3 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. at 94 (1978)).

STB relies on the same evidence from its § 707(b)(3) motion, discussed *infra,* to support conversion under § 706(b) and does not provide any separate grounds for conversion. *See STB's Brief,* Dckt. No. 123. The UST delves somewhat into discrete grounds for conversion under § 706(b), arguing that "all interested parties would benefit from converting this case to chapter 11," including Debtor, who he argues would benefit from the protection of the automatic stay while he continues his litigation with K.A.P. *UST's Brief,* Dckt. No. 126 at 14–15.

Courts have relied on various factors to determine whether conversion under § 706(b) is appropriate. The UST, citing *Gordon,* mentions several of these factors

in his brief: (1) the debtor's ability to repay debt; (2) the absence of immediate grounds for reconversion pursuant to 11 U.S.C. § 1112; (3) the likelihood that the debtor can confirm a Chapter 11 plan; and (4) whether parties in interest, including the debtor, would benefit from converting the case to Chapter 11.[5] *Id.* at 14; *Gordon,* 465 B.R. at 692–93.

 The UST argues that the facts of this case are similar to those in *Gordon,* and thus a similar result (conversion under § 706(b)) should follow. *UST's Brief,* Dckt. No. 126 at 15. In *Gordon,* however, the debtor was not subject to the abuse provisions of § 707(b) as Debtor here is because that debtor did not have primarily consumer debts. I find that *Gordon* is distinguishable. More importantly, I find that where both § 706 and § 707(b) may apply, the more specific provisions of § 707(b) should take precedence. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* ── U.S. ──, 132 S.Ct.

2065, 2070–71, 182 L.Ed.2d 967 (2012) (A well-established canon of statutory interpretation is that the specific governs the general, particularly when the two are parts of the same statutory scheme).

 As originally written, § 706 dealt only with conversion and § 707 dealt only with dismissal. Later amendments included the remedy of conversion in § 707(b), but only with respect to consumer debtors. Thus, for non-consumer debtors such as *Gordon,* § 706 is the only avenue to convert a Chapter 7 case. For consumer debtors, however, both sections apply. Because § 707(b) is the more comprehensive of the two, § 707(b) should be used exclusively for deciding conversion issues when the issue is bad faith or abuse. All that remains under § 706 for a consumer debtor is whether a discretionary conversion is warranted for reasons other than those that fit into the body of law interpreting bad faith and abuse under § 707(b).[6]

5. Other factors under § 706 that courts have considered include the nature of the debtor's assets and business operations and whether a separate business infrastructure exists, as well as the amount of administrative expenses that would accrue in a Chapter 11 case. *Ryan,* 267 B.R. at 637–638; *In re Watkins,* 132 B.R. 781 (Bankr.S.D.Fla.1991); *In re Lenartz,* 263 B.R. 331, 335 (Bankr.D.Idaho 2001).

6. Here, to the extent that § 706 remains relevant to this case, I find that Debtor has no business to reorganize, which weighs against a finding that the case should be converted. Additionally, the administrative expenses that would accrue in a Chapter 11 case would be substantial, and therefore, this factor does not support conversion. It does not appear, however, that a conversion would be futile in light of 11 U.S.C. § 1112(b) as it is not apparent at this time that any of the factors evidencing "cause" for dismissal would apply to Debtor. The principal consideration in analyzing § 706(b) is what result would benefit the creditors, debtor, other parties in interest, and the estate. In considering whether conversion would inure to the benefit of all par-

ties, the Court agrees that the estate would benefit from conversion to Chapter 11. As noted *infra,* Debtor has the ability to pay a meaningful portion of his debt in Chapter 11 and the estate would be larger in a Chapter 11 as Debtor's earnings would be able to be included pursuant to 11 U.S.C. § 1115. However, the benefit to the estate must be balanced with the impact on Debtor, and conversion under these circumstances would not further the Debtor's interests. Debtor would not be permitted to reconvert to Chapter 7. *See* 11 U.S.C. § 1112(a)(3) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title unless ... the case was converted to a case under this chapter other than on the debtor's request."). Instead, Debtor would for five years be, like the similarly situated debtor in *Lobera,* "trapped in a Chapter 11 proceeding that he does not need and does not want." *Lobera,* 454 B.R. at 854–55. The court in *Lobera* went on to explain why conversion was inappropriate: "There is no business to reorganize. This is not the fresh start tha[t] Congress envisioned. Balancing this consideration against the in-

Based on a review of the entire record, I find there to be insufficient evidence to support a discretionary conversion pursuant to § 706. Conversion would not inure to the benefit of all parties here. Therefore, Movants have not met their burden, and Debtor's case should not be converted to Chapter 11 under 11 U.S.C. § 706(b).

*Conversion or Dismissal under § 707(b)(3)(B)*

■■■ Movants contend that Debtor's case is abusive, and that it should be dismissed or converted to Chapter 11. 11 U.S.C. § 707(b)(1) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title it if finds that the granting of relief would be an abuse of the provisions of this chapter.

In assessing whether a filing is abusive under § 707(b)(3)(B) the Court must consider whether the "totality of the circumstances ... of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B). The burden is on the movants to establish by a preponderance of the evidence that Debtor's filing is abusive. *In re Cribbs*, 387 B.R. 324, 332–33 (Bankr. S.D.Ga.2008) (Davis, J.); *In re McKay*, 463 B.R. 915, 920 (Bankr.S.D.Ga.2010) (Davis, J.); *In re Ricci*, 456 B.R. 89, 104 (Bankr. M.D.Fla.2009); *In re Golematis*, slip copy, 2012 WL 3583154, at *2 (Bankr.E.D.Mich. Aug. 17, 2012).

■■■ This Court has previously utilized a totality of the circumstances analysis·that required an assessment of eight non-exclusive factors.[7] *In re Truax*, 446 B.R. 638, 642 (Bankr.S.D.Ga.2010) (Davis, J.); *In re Allen*, 411 B.R. 913, 921–22 (Bankr.S.D.Ga.2009) (Davis, J.); *In re James*, 414 B.R. 901, 914 (Bankr.S.D.Ga. 2008) (Davis, J.). The most important factor is "whether a debtor has the ability to repay a meaningful portion of his debts from future income....". *James*, 414 B.R. at 914. Additional factors include: (1) Whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity, such as an illness or unemployment; (2) Whether the debtor is eligible for chapter 13 or chapter 11 relief; (3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations; (4) Whether the debtor could provide a "meaningful" distribution in a chapter 13 case; (5) Whether the debtor's expenses could be reduced significantly without depriving the debtor and his or her dependents of necessities, including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; (6) The period of time over which the debts were incurred; and (7) Whether the debtor has a stable source of future income. *Truax*, 446 B.R. at 642.

creased estate, the Court finds that the case should not be converted to Chapter 11." *Id.* at 855.

7. However, in *McKay* I made it clear that the totality of the circumstances test is not a mere mechanical exercise. *McKay*, 463 B.R. at 921

("this Court refuses to apply the factors in a mathematical way. As I am directed by the Code, I will—as always—assess the 'totality of the circumstances' holistically, not simply mechanically run down a checklist.").

As more and more cases are presented, it becomes clear that there is considerable overlap and redundancy in these factors. Greater clarification is desirable to properly explain the Court's analysis. Thus, at this time, I will restate and combine related factors to help simplify and further elucidate the analysis:

(1) Can Debtor, from anticipated income and reasonable budget adjustments, repay a meaningful amount of his debt? Is Debtor eligible for a Chapter 13 or Chapter 11 case that hypothetically would pay a substantial or meaningful dividend to creditors over a five-year repayment period?

(2) Does Debtor have a stable source of future income sufficient to repay a meaningful amount of debt and still provide an opportunity to restore himself to a stable financial position?

(3) Did Debtor experience some unforeseeable calamity that triggered the filing?

(4) Were the debts incurred over a significant period of time, consistent with Debtor's ability to manage them, or were they the result of recklessness or unrealistic expectations about ability to repay, such as occurs in a pre-bankruptcy spending spree?

(5) Did Debtor make good faith efforts prior to filing to deal with the debt without resorting to bankruptcy?

(6) Is Debtor using the bankruptcy process to restore Debtor's financial stability and obtain a fresh start, or to improve Debtor's financial standing, for example, by retaining all valuable property secured by outstanding debts and discharging unsecured debt in order to enable the retention of substantial assets?

(7) Are there other factors concerning the nature of Debtor's obligations that aggravate or mitigate the impact of Debtor's past behavior or future prospects?

■ The Court will now assess these factors as they pertain to whether the totality of the circumstances indicates Debtor's case should be dismissed or converted as abusive.·

**(1) Can Debtor, from anticipated income and reasonable budget adjustments, repay a meaningful amount of his debt ? Is Debtor eligible for a Chapter 13 or Chapter 11 case that hypothetically would pay a substantial or meaningful dividend to creditors over a five-year repayment period ?**

This case is pending as a Chapter 7 case. Currently the Trustee is holding for distribution $185,000.00 which, after estimated expenses of administration, will yield a dividend to unsecured creditors of approximately 6.6% in this Chapter 7 case. Debtor, STB, and the UST have submitted their projections in post-trial briefs, and I have reviewed their analyses of the additional sums a hypothetical Chapter 11 [8]

---

**8.** Debtor is not eligible for Chapter 13 because of the amount of his unsecured debt. However, Debtor is eligible for Chapter 11. *See Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (an individual debtor not engaged in business is eligible to reorganize under Chapter 11). The Court notes that conversion to Chapter 11 will have a higher administrative burden than a Chapter 13. Additionally, Chapter 11 itself, al-

though available, is no sure thing. It is not a foregone conclusion that a plan can be confirmed over creditors' objections, and there is nothing to suggest that a Chapter 11 case would be any more amicable than the legal proceedings which thus far have cost Debtor $176,212.18 in defense of the claims filed by K.A.P. and STB. Dckt. No. 130. I reject the blithe assertion of the UST that a Chapter 11

would generate from Debtor's future income over five years. Dckt. Nos. 124, 123, and 126. Upon review, I find Debtor's analysis to be the most precise, fact-based, and accurate. Debtor's analysis suggests that the amount of future income Debtor could devote to a hypothetical Chapter 11 would be approximately $377,000.00. Dckt. No. 124 at 5. If Debtor files a Chapter 11, is able to have a plan confirmed a few months hence, and there are no unforeseen reductions in disposable income for five years thereafter, the anticipated

dividend would increase by 15.3% from a Chapter 7 dividend of 6.6% to 21.9%, after taking into account the money held by the Chapter 7 Trustee, Debtor's projected 2012 tax refund, and the projected administrative expenses for a Chapter 11 case.[9]

■ Even in this "best case scenario" from Debtor's view, by most any standard, Movants have carried the burden of showing that the "ability to pay" element of a totality of the circumstances analysis has been met.[10] Still, the inquiry does not end

case in these circumstances would be either simple or inexpensive.

9. In arriving at this number, I note that Debtor's counsel responded to comments made by me from the bench that the payment of $1,170.00 per month for life insurance benefits for his adult sons was questionable, by removing that expense item from his deductions. However, his budgeted housing expense of $1,250.00 for rent is unusually modest for a person of his income. If the Court needed to fine tune a budget for the purposes of this case, a higher housing expense could completely offset this life insurance expense. This would reduce the projected payout by approximately $70,000.00 ($1,170.00 × 60) and the dividend to around 19% over five years, which is only 12.4% higher than a Chapter 7 payout that could be made within a few months. I would not disallow such an adjustment in housing, and if the Debtor chose to forego the added comfort attainable with a higher living expense in order to provide for his sons, that is not, in my view, a disallowable shift of resources. See In re McKay, 463 B.R. 915, 922 (Bankr.S.D.Ga. 2010) (Davis, J.) ("If Debtors desire to sacrifice in some areas in order to keep their house, such tradeoffs are allowable in bankruptcy.").

10. But see the comprehensive and thoughtful analysis of my colleague, the Honorable Benjamin Cohen, in In re Attanasio, 218 B.R. 180 (Bankr.N.D.Ala.1998), on the difficulty of assessing ability to pay. It must be emphasized that his case was decided prior to the BAPCPA amendments when the presumption that the debtor was entitled to seek Chapter 7 relief was dropped and the standard was changed from "substantial abuse" to "abuse."

Still, pre-BAPCPA precedent informs courts on how to discern cases where abuse exists. In re Cribbs, 387 B.R. 324, 333 (Bankr. S.D.Ga.2008) (Davis, J.) ("Section 707(b)(3) incorporates the judicially constructed tests of bad faith and totality of circumstances, concepts which were used pre-BAPCPA for determining whether a debtor's Chapter 7 case should be dismissed for 'substantial abuse.' Thus, it is appropriate to apply pre-BAPCPA concepts for determining 'abuse' under current § 707(b)(3)."). The collection of cases and the discussion in Attanasio highlights that ability to pay is a complex and nuanced inquiry not capable of mathematical calculation. For instance, with regard to whether ability to pay should be measured by the total dollar amount or the percentage of debt that will be paid and whether it should depend on the relative incomes of wealthy or poorer debtors, the court noted:

Arguably, there is an ideal level of income, absent extenuating circumstances, that will easily allow a normal family of a certain size to live a reasonable lifestyle. But does 707(b) require a debtor to apply anything received over and above that level of income, even if it is a pittance, to the payment of creditors? Or is 707(b) activated only if a debtor can pay a significant or substantial amount of money to creditors? If that is the proper question, does a 'rich' or relatively wealthy person not have the ability to pay a substantial amount of money to creditors, whether that is a substantial portion or percentage of his or her overall debt or not? And conversely, does a 'poor' or relatively impecunious person by definition not lack the ability to pay a substantial amount of money to creditors, whether that

there, notwithstanding what facially is a substantial sum of money. Ability to repay debt is not the Court's sole consideration,[11] and based on my prior decisions, Movants must show more. *See McKay*, 463 B.R. at 921; *In re Cribbs*, 387 B.R. 324, 335 (Bankr.S.D.Ga.2008) (Davis, J.). In *Cribbs* this Court noted that, though ability to pay is the primary factor to be considered in a totality of the circumstances analysis, "if it is the only indicia of abuse, the case should not be dismissed under that test." *Cribbs*, 387 B.R. at 335

(quoting *In re Nockerts*, 357 B.R. 497, 507 (Bankr.E.D.Wis.2006)). I reaffirm that ruling here.

It is noteworthy that the Court in *In re Attanasio*, 218 B.R. 180 (Bankr.N.D.Ala. 1998), concluded that reviewing ability to pay in the abstract was so subjective and value-based as to risk lack of equal and uniform treatment of debtors. The court suggested the proper framework was by reference to objective data of overall expenses in similar households.[12]

---

is a substantial portion or percentage of overall debt or not?
*Id.* at 192 (emphasis added). The court in *Attanasio* also questioned whether all debtors are required to live the same lifestyle during the period of repayment.

Can a court create an equal playing field for application of 707(b) unless all are required to live the same lifestyles and all have the same level of living expenses? Should one debtor be allowed to drive a bigger or more expensive car than another? Must all debtors send their children to public schools rather than private schools? Should one debtor be allowed to pay for a child's college education while another may not? Should all debtors be forbidden from giving to religious organizations and charities during the period of repayment? Should one debtor's family be allowed to eat more or use more electricity or water or gasoline than other debtors? Should one debtor be allowed to take a vacation during the period of repayment while another is forced to stay home?

*Id.* at 196; *see also In re Lapke*, 2008 WL 901846, at *4 (Bankr.D.Neb. Mar. 31, 2008) ("[W]hen the presumption of abuse does not arise under 11 U.S.C. § 707(b), there is no 'bright line' rule as to whether a debtor's income, housing, or other expenses are so high that it would be an abuse of the provision of the Bankruptcy Code to grant Chapter 7 relief. Instead, it is akin to 'you'll know it when you see it.' ").

11. The Eleventh Circuit recently examined whether a debtor's ability to pay his or her debts may be taken into account under the totality of the circumstances test in § 707(b)(3)(B) and determined that such an

inquiry is permitted. *In re Witcher*, 702 F.3d 619, 623 (11th Cir.2012). However, the court declined to address how much weight a court should properly give to the debtor's ability to pay or whether ability to pay alone could be dispositive under a totality of the circumstances analysis. *Id.*

12. The court stated:

The key to a fair review of a debtor's expenses and lifestyle is for the review to be based on publicly acknowledged, objective criteria, not on moral perspectives, subjective beliefs or life experiences of those making the review. The appropriate test then to assure such a review is to compare a debtor's total family expenses to the typical expenses of debtors in similarly situated households, with [u]pward adjustments for higher costs of living attributable to a particular debtor's family-rather than through an item by item examination. Such information is published regularly and is readily available from federal government agencies such as the U.S. Government Printing Office, or from government document departments of public libraries . . . .

The use of such objective criteria serves several purposes. It provides an objective starting point and reference point for all participants in the 707(b) litigation process. It provides an evidentiary basis for 707(b) determinations. It helps insure equality of treatment for similarly situated debtors. And, it bolsters the credibility of the bankruptcy court and bankruptcy process by measuring the situations of all debtors against objective criteria available to all persons.

*Attanasio*, 218 B.R. at 210.

In some respects BAPCPA, in adopting the means test in 2005, introduced such an objective standard.[13] *See* 11 U.S.C. § 707(b)(2). As noted above, here Debtor has "passed" the means test, which is based on historical, not future, income and expenses. *Cribbs,* 387 B.R. at 332 ("[T]he means test is based upon historical income and expenses ...."). When Congress adopted the alternative "totality of the circumstances" analysis as a basis for sifting out and identifying abuse, it did not expressly or impliedly eliminate a court's duty of inquiry into future income and expenses. But because Congress did not adopt in § 707(b)(3)(B) a purely mathematical "future income" payment approach similar to the means test, I remain convinced that legislative intent was for courts not to be limited solely to a mathematical calculation of ability to pay, but rather to include behavioral elements as well.

Clearly, with BAPCPA the bar was lowered from "substantial abuse" to "abuse," and a debtor enters Chapter 7 with no presumption in his favor. Yet conceptually the historic notion persists that abuse should not be predicated solely on having "sufficient income to pay some substantial part of [the] indebtedness" unless there is an ability to make such payments "without difficulty, as they become due." *In re Balaja,* 190 B.R. 335, 340 (Bankr.N.D.Ill. 1996). When this concept is coupled with the statutory command that the "totality of the circumstances" should demonstrate abuse, it is clear to me that ability to pay remains only one of the factors a court should rely upon, despite several other courts' finding that ability to pay, standing alone, is sufficient to support a finding that abuse has occurred. *Compare, e.g., U.S. Trustee v. Harris,* 960 F.2d 74, 77 (8th Cir.1992) (ability to pay alone can be a sufficient reason for finding abuse), *and In re Henebury,* 361 B.R. 595, 607 (Bankr. S.D.Fla.2007) ("[T]he ability to pay, standing alone, is sufficient."), *with In re Green,* 934 F.2d 568, 572 (4th Cir.1991). (Ability to pay is the primary factor to be considered, but other factors must also be considered alongside it), *and Cribbs,* 387 B.R. at 334 ("[T]he Trustee must show more than just Debtors' ability to pay."), *and In re Cemal,* 396 B.R. 649, 655 (Bankr. E.D.Va.2004) (ability to pay is one of many factors and cannot serve as the sole basis for dismissing a Chapter 7 case for substantial abuse).

Having concluded that Debtor's "ability to pay" supports a finding of abuse, but that other factors must be considered, I now proceed to analyze those factors.

**(2) Does Debtor have a stable source of future income sufficient to repay a meaningful amount of debt and still provide an opportunity to restore himself to a stable financial position?**

Debtor has a stable future income. This generally supports a finding of abuse; however, considering Debtor's age and the time horizon to complete a five-year payout to get a "fresh start" and reestablish some semblance of his pre-calamity condition, this factor does not weigh in favor of a finding of abuse.

The Legislative History to the pre-BAPCPA version of § 707(b) explained the goal of a "fresh start":

This provision represents a balancing of two interests. It preserves the fundamental concept embodied in our bank-

---

**13.** Congress created in the means test a "needs-based test to remedy the 'inherently vague' 'substantial abuse' dismissal standard." *In re Clary,* slip copy, 2012 WL 868717, at *15 (Bankr.M.D.Fla. Mar. 14, 2012) (quoting H.R.Rep. No. 109–31, pt. 1 at 2 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 98).

ruptcy laws that *debtors who cannot meet debts as they come due should be able to relinquish nonexempt property in exchange for a fresh start.* At the same time, however, it upholds creditors' interests in obtaining repayment *where such repayment would not be a burden.* Crushing debt burdens and severe financial problems place enormous strains on borrowers and their families. Family life, personal emotional health, or work productivity often suffers. By enabling individuals *who cannot meet their debts to start a new life,* unburdened with debts they cannot pay, the bankruptcy laws allow troubled borrowers to become productive members of their communities. Nothing in this bill denies such borrowers with *unaffordable debt burdens* bankruptcy relief under Chapter 7. However, *if a debtor can meet his debts without difficulty as they become due,* use of Chapter 7 would represent a substantial abuse.

S.Rep.No. 65, 98th Cong., 1st Sess. 53–54 (1983) (emphasis added). This explanation of how § 707(b) was meant to be applied pre-BAPCPA has been referred to by the United States Courts of Appeal for both the Eighth and Ninth Circuits as "the best available evidence of Congress's intent in enacting section 707(b)." *In re Walton,* 866 F.2d 981, 983 (8th Cir.1989) (quoting *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914 (9th Cir.1988)). Additionally, the court in *Attanasio* explained:

> Instead of requiring dismissal of a Chapter 7 case whenever the debtor had sufficient income to pay some substantial part of his or her indebtedness, as with the future income test, 'substantial abuse' was seen as requiring dismissal only where the debtor has sufficient income to pay all of his or her indebtedness, without difficulty, as it becomes due ... If requiring repayment by a debtor of his debts would be a burden

that would place an enormous strain on the debtor or the debtor's family, or otherwise cause family life, personal emotional health or work productivity to suffer, then that would be one indication that the debtor cannot meet debts as they become due.

*Attanasio,* 218 B.R. at 236–39, nn. 90, 92.

Since BAPCPA did not adopt a pure bright line "future income" test in § 707(b)(3) I find that the "totality" inquiry must be analyzed within the context of a fresh start in which debtor has the opportunity to restore himself to a measure of financial health. *See In re White,* 49 B.R. 869, 873 (Bankr.W.D.N.C.1985) (dismissal of case disfavored where such dismissal would force debtor to labor "without incentive and without the opportunity to improve his position that is so fundamental to what is referred to as the 'American way of life.'"); *cf. Local Loan Co. v. Hunt,* 292 U.S. 234, 244–45, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (purpose of Bankruptcy Act is to give the honest but unfortunate debtor "a new opportunity in life and a clear field for future effort ... [which] would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.").

At age sixty, a five-year payout based on a minimalistic lifestyle leaves Debtor with a limited time frame in which to obtain the restoration to financial health that a properly-applied fresh start requires. He is in good health, highly skilled, and obviously capable of long hours of work, but within the horizon of a Chapter 11 plan it is foreseeable that Debtor might not be able to maintain the grueling schedule he has had until now. And in the final analysis,

what would motivate someone to make such a sacrifice if there is a diminished likelihood there will be a state of financial stability beginning in year six?

Moreover, the K.A.P. claim creates a major impediment to Debtor obtaining a timely fresh start if he is forced into a Chapter 11 case. As it stands now, as discussed earlier, a projected dividend of 6.6% to unsecured creditors in this Chapter 7 includes the estimated K.A.P. claim of $115,000.00. However, K.A.P. is seeking a ruling that its asserted claim of $875,000.00 is nondischargeable. That issue may take months or years to resolve. In the meantime, K.A.P. would have no incentive to support a Chapter 11 plan that is projected to pay just over 20% of its smaller estimated claim, leaving an uncollected balance for it to collect more than five years from now. Further, the other unsecured creditors whose debts are dischargeable will have no incentive to support a plan in which K.A.P. is paid a higher percentage than they are.

This alone makes any possible Chapter 11 plan confirmation dubious in the short run, and if the K.A.P. claim is nondischargeable, Debtor will not be able to address 80% of whatever that claim is until after completion of a Chapter 11 more than five years hence.

In contrast, if this case continues as a Chapter 7, all unsecured creditors will be paid pro-rata, perhaps within months. Debtor will receive a discharge of all his debt that is not tainted by any misconduct. Immediately thereafter, he will have to address the potential nondischargeability of the K.A.P. claim, and if it is so determined, he will pay it from future income over perhaps several years. If the debt is nondischargeable, this is as it should be. The point is, however, that in Chapter 7 he will be able to begin paying on the final claim that may impair his fresh start at least five years earlier than if he is forced into a Chapter 11.

**(3) Did Debtor experience some unforeseeable calamity that triggered the filing or did Debtor simply pyramid debt until it became unmanageable?**

Debtor, a hardworking, well-compensated, and highly skilled professional, incurred debt on a personal residence, two vacation/investment homes in Colorado, and commercial property related to his medical practice. Unforeseeably to him the real estate market collapsed, threatening financial ruin in the commercial arena and eviscerating his very large equity in the vacation/investment homes. He suffered substantial cost overruns [14] on an expensive renovation of his personal residence, and was making financial arrangements to cover the overrun costs he acknowledged when he was presented with a construction claim far in excess of what he believed correct, and one which, at least when it was presented, was poorly documented. As he made the effort to sort out the basis and amount of the large claim, the claimant filed a lien on his unfinished home, severely undercutting his ability to obtain permanent, long-term, and affordable financing on the home. This set of circumstances clearly constitutes an unforeseeable financial calamity.[15] There-

---

**14.** The initial base bid for the renovation was $1,100,000.00 (Debtor's Exh. 1), and Debtor has paid that amount in full. Debtor's Exh. 9. K.A.P. filed a contractor's lien for $544,000.00 (Debtor's Exh. 11), nearly 50% above the initial estimate, and K.A.P.'s claim is currently at 5875,000.00, nearly 80% above the initial estimate.

**15.** These facts are distinguishable from the facts in *In re Allen*, 411 B.R. 913 (Bankr. S.D.Ga.2009) (Davis, J.), a case which Movants argue is similar to the present case, be-

fore, this factor does not support a finding of abuse.

**(4) Were the debts incurred over a significant period of time, consistent with Debtor's ability to manage them or are they the result of recklessness or unrealistic expectations about ability to repay, such as a pre-bankruptcy spending spree?**

The period of time over which the debts were incurred does not support a finding of abuse. Debtor's major debts accrued years before his bankruptcy filing, and they certainly were not incurred in a last minute spending spree, which if such facts were present, would lead to a different conclusion regarding abuse. *See, e.g., Truax*, 446 B.R. at 645 (highlighting a questionable purchase fifteen days before the filing date of a $26,413.83 new car). The history of Debtor's accruing debts has been outlined clearly elsewhere in this Order and needs no further elaboration. This line of inquiry does not support a finding of abuse.

**(5) Did Debtor make good faith efforts prior to filing to manage the debt without resorting to bankruptcy?**

Debtor appears at all times to have dealt fairly and honorably with his creditors. He historically has had large debts, both personal and investment in nature, but earned substantial income as a physician and was managing his debt until the unprecedented and unforeseeable economic meltdown from 2008 forward destroyed his equity in his residence, and decimated his equity in investment property. He then agreed to sell the investment property to pay the secured debt, but lost most of his equity in it. He took on the back-breaking additional burden of seventy hours of monthly emergency room work in a nearby community in order to fund his debts, attempt to complete his home renovation, and ultimately fund his defense of what he considered an excessive claim of lien by K.A.P. A week-long mediation presided over by a well-respected Superior Court Judge reached a numerical settlement, but Debtor, strapped for cash, and unable to finance that sum could not consummate the settlement.

No witness called by STB or the UST testified, nor were any documents introduced to contradict or negate my conclusion that Debtor dealt at all times with his lenders in a forthright and cooperative way to resolve his debt crisis. For example, despite the huge losses in value of the vacation/investment home, Debtor, at the urging of his lenders on his primary residence, sold his Colorado property and paid that debt off.[16]

In the final analysis, his lenders chose not to extend additional funds to him in order to payoff the K.A.P. lien or to provide long-term financing for his home, which he believed he could fund. This is not to suggest anything negative concerning the lenders' actions, as it is entirely likely that given the debt size compared to shrinking asset values, it simply was not a loan the lenders could underwrite. The point is, unlike the debtor in this Court's decision in *In re James*, 414 B.R. 901, 916 (Bankr.S.D.Ga.2008) (Davis, J.), who "made no efforts to seek a non-bankruptcy remedy to deal with [her] debt," Debtor

---

cause in *Allen* the record showed no evidence that the debtor filed bankruptcy because of an unforeseen calamity.

**16.** Perversely, had he refused to sell this property into a collapsing market, it is possible

that this litigation would never have ensued at all. The retention of that investment property could have resulted in his debt not being "primarily" consumer debt at all—a threshold requirement to the entire § 707 process. *See infra* at 455–57.

here carried the ball as far as he could go. He could not obtain credit from the lender that knew the most about his financial situation, and he was forced to face the inevitable: seek bankruptcy protection and surrender his primary residence to those who held the security documents, which at one time fully covered the debt, but now do not.

These circumstances lead me to the conclusion that in dealing with his creditors he acted in an appropriate fashion, and so this factor does not support dismissal.

**(6) Is Debtor using the bankruptcy process to restore Debtor's financial stability and obtain a fresh start, or to improve Debtor's financial standing, for example, by retaining all valuable property secured by outstanding debts and discharging unsecured debt in order to enable the retention of substantial assets?**

I find that Debtor is not using the bankruptcy process to "game" the system. To the contrary, he has sold or surrendered all his personal real estate, has reduced his secured debt and, whatever the outcome of these Motions to Convert or Dismiss, will retain little, if anything, in the way of secured property.

**(7) Are there other factors concerning the nature of Debtor's obligations that aggravate or mitigate the impact of Debtor's past behavior or future prospects?**

This case illustrates the complexity and conceptual difficulty of applying what is intended solely as a consumer bankruptcy body of law to a fact pattern atypical of a consumer bankruptcy case. By definition, Debtor is, and has been stipulated to be, subject to § 707(b) which requires as a threshold that the debts be "primarily[17] consumer debts." 11 U.S.C. § 707(b)(1) ("the court.... may dismiss a case filed by an individual debtor under this chapter *whose debts are primarily consumer debts,* or, with the debtor's consent, convert such case....") (emphasis added). However, Debtor has substantial obligations he must deal with because of his professional (i.e., commercial), rather than personal (i.e., consumer) circumstances.

Debtor is liable for approximately $1,500,000.00 as a guarantor of STB debts incurred with his professional colleagues for commercial purposes. He also services debt to LMC Funding as a condition of his employment. Still, the claim on his personal residence exceeded $2,700,000.00 at filing, and debt on a personal residence is widely accepted to be "consumer" debt,[18] so despite many factors that give his case the look and feel of a business case, it is by definition, not.

The great intangible and mitigating factor in Debtor's case is that had he spurned STB's request and refused to liquidate his valuable investment property in Colorado at what may have been the market bottom, two things would likely be different. By now, he might have seen real estate prices rebound to a level where a current sale would yield him some of the $2,000,000.00

---

**17.** Most courts have determined that "primarily" means more than half of the total dollar amount owed. *See, e.g., Stewart v. U.S. Trustee (In re Stewart),* 175 F.3d 796, 808 (10th Cir.1999); *In re Hall,* 258 B.R. 45, 48 (Bankr. M.D.Fla.2001); *In re Hoffner,* 2007 WL 4868310, at *2–3 (Bankr.D.N.D. Nov. 21, 2007).

**18.** *See In re Woodard,* 2009 WL 1651234, at *2 (Bankr.M.D.N.C. Jun. 10, 2009) ("An overwhelming majority of courts that have considered the issue of whether debt secured by real property used as a debtor's personal residence is consumer debt have held in the affirmative ....").

in estimated equity that vanished at the depths of the recession. A sale of this property at a more opportune time would have enabled Debtor to better manage his debt. But more importantly, had he held onto that property until he filed, his non-consumer debt [19] might well have exceeded his consumer debt as shown here:

| Consumer Debt | | Minimum | Maximum |
|---|---|---|---|
| | STM | $1,700,000.00 | $1,700,000.00 |
| | STB | $905,000.00 | $905,000.00 |
| | K.A.P. | $115,000.00 [20] | $875,000.00 [21] |
| Total | | $2,720,000.00 | $3,480,000.00 |

| Non–Consumer Debt | | Minimum | Maximum |
|---|---|---|---|
| | Colorado Property | $1,360,000.00 [22] | $2,300,000.00 [23] |
| | Guaranty Debt | $1,360,000.00 [24] | $1,500,000.00 [25] |
| Total * | | $2,720,000.00 | $3,800,000.00 |

\* As noted supra, Debtor is paying $6,600.00 monthly to LMC Funding. Although he is not personally liable to LMC for the debt, it is a condition of his employment. The requirement that he divert his personal cash flow to service this commercial debt renders it, in effect, though not by definition, a personal non-consumer obligation.

Historically, his total debt service obligations were primarily non-consumer in nature. Had he not done his very best to deal with his debt crisis by liquidation of

19. The Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(8). The Code does not define "non-consumer debt", but courts have held that the test for determining whether a debt is non-consumer is whether it was incurred with a profit motive. *See, e.g., In re Booth*, 858 F.2d 1051, 1055 (5th Cir.1988) ("[T]he test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit."); *In re Stewart*, 175 F.3d 796, 806 (10th Cir.1999) (" 'Consumer debt' is further distinguished from 'non-consumer' debt as a debt incurred with a 'profit motive.' "). There are also other types of debt that are not business debts, but which fall outside the category of consumer debt. *IRS v. Westberry (In re Westberry)*, 215 F.3d 589, 593 (6th Cir. 2000) (income taxes not consumer debt); *In re Marshalek*, 158 B.R. 704, 708 (Bankr. N.D.Ohio 1993) ("An inability to classify a particular debt as a business debt does not automatically relegate it to the status of a consumer debt.").

The guaranty debt to STB was incurred by Debtor's medical practice, and thus, it is clear that this debt was incurred with a profit motive and is non-consumer debt. As for the Debtor's Colorado property, at trial he testified that this property was a rental property. Although he also explained that the property was to be used as a vacation home, from his testimony it appears that his investment interest in the property was the primary purpose in incurring this debt rather than personal or family use. Accordingly, this debt is also non-consumer debt.

20. Estimated based on the settlement amount from Debtor and K.A.P.'s mediation less the sum Debtor has already paid.

21. Based on K.A.P.'s claim amount.

22. The debt amount for Debtor's Colorado property is unknown, but if the debt exceeded this amount, his non-consumer debt would have been greater than his consumer debt.

23. Based on the sales price of the Colorado property, which Debtor testified paid off his Colorado property debt to STB.

24. Based on the claims STB has filed in the case for the guaranty debt. Movant's Exh. 8.

25. Based on Debtor's maximum liability under his personal guaranties. *See id.*

some of that debt, he would have remained a non-consumer debtor on the date of filing. In that case, he would never have been subject to any of the § 707(b) provisions that are the focus of this litigation.

This factor is a mitigating one in arriving at a holistic view of whether this Debtor has been abusive which, as I have held, requires a "corrupt, deceitful, perversion of the Bankruptcy Code." *McKay*, 463 B.R. at 920; *see also In re Hibbard*, 448 B.R. 296, 300 (Bankr.S.D.Ga.2009) (Davis, J.) ("[I]t is correct to say that the ultimate conclusion in these cases depends on whether a debtor passes the 'smell test' after consideration of all the factors. That is, upon consideration of those factors, is a bankruptcy court left with the conviction that the debtors have ... abused the bankruptcy process?").

### *CONCLUSIONS OF LAW*

So what is the correct result for a case such as this, which, if filed under Chapter 11 could theoretically pay as much as 15% more, or $377,000.00 more to creditors over a five-year period than his pending Chapter 7, when, other than the magnitude of payments, there is no evidence whatsoever that Debtor has abused the bankruptcy process? The answer lies not only in the statute, which I have already concluded evidences that Congress made a policy decision not to base a "totality" grounds dismissal solely on ability to pay, but within the historical context that debt relief has in our laws and traditions.

At least from the founding of this Republic, there has been a recognition of the critical role of a system for debt relief in a vibrant free market. Article I of the United States Constitution provides, among Congress's powers, the right to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. This enshrined, as supreme federal law, the concept of debt relief, which came to these shores 280 years ago with the founding of Georgia, the Thirteenth British Colony. Here in Savannah in 1733, General James Oglethorpe was sent with a charter that envisioned a fresh start in a new land, free of debt, for English citizens who had been imprisoned for unpaid debt.

Whereas we are credibly informed, that many of our poor subjects are, through misfortunes and want of employment, reduced to great necessity insomuch as by their labor they are not able to provide a maintenance for themselves and families; and if they had means to defray their charges of passage, and other expences, incident to new settlements, they would be glad to settle in any of our provinces in America where by cultivating the lands, at present waste and desolate, they might not only gain a comfortable subsistence for themselves and families, but also strengthen our colonies and increase the trade, navigation and wealth of these our realms ... Know ye therefore, that we have ... willed, ordained, constituted and appointed ... James Oglethorpe ... and such other persons as shall be elected in the manner herein after mentioned, and their successors to be elected in the manner herein after directed ... and shall be one body politic and corporate, in deed and in name, [known] by the name of the Trustees for establishing the colony of Georgia in America.

SELECT CHARTERS AND OTHER DOCUMENTS ILLUSTRATIVE OF THE HISTORY OF THE UNITED STATES, 1606–1775 at 236–237 (William MacDonald ed., The Macmillan Company 1899).

Since that time, bankruptcy legislation has evolved, but in 1978 the modern Bankruptcy Code was adopted. The Bankruptcy Reform Act of 1978 evolved from a

"creditor-based, punitive model of debt proceedings to one which is primarily an affirmative debtor's remedy". 1 NORTON BANKR.L. & PRAC. 3d § 1:4. The 1978 Code made it easier for both businesses and individuals to "file a bankruptcy petition, commence a bankruptcy case, to reorganize, and, in appropriate circumstances, obtain a discharge." *Id.* at § 1:8.

The principal purpose of the modern Bankruptcy Code is to "grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank,* 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). This concept encapsulates the two, sometimes competing, goals for a balanced bankruptcy process. One is to provide relief to citizens who have suffered severe financial setbacks in order to lift the desperation caused by overwhelming debt and discharge certain obligations to allow the debtor a "new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). The other is to protect certain creditors who Congress has deemed to have an interest that outweighs the debtor's interest in a fresh start and prevent abuse or fraud by debtors. *Id.* at 287, 111 S.Ct. 654. For example, obtaining a discharge has been curtailed as to certain types of debt and by certain types of misconduct. These are now codified in 11 U.S.C. §§ 523 and 727. Other provisions apply a good faith standard to debtors seeking to reorganize their debt structure. 11 U.S.C. §§ 1325(a)(3), 1129(a)(3).

And in Chapter 7 cases, beginning in 1984, the Court could deny relief entirely if the case constituted a "substantial abuse." *In re Krohn,* 886 F.2d 123, 125–26 (6th Cir. 1989).

In 2005 BAPCPA dropped the word "substantial" but readopted the concept of "abuse" as a limit on the types of debtor behavior that could be excused in permitting access to a Chapter 7 discharge. Congress created a mathematical formula in the means test to assist in screening new Chapter 7 cases in § 707(b)(2). If a debtor fails the means test, that debtor is presumed to have abused the system and can be denied access to the Court in a Chapter 7 case. For those who "pass" the means test, Congress provided in § 707(b)(3) an alternate avenue to the same end if a court finds the debtor to have filed "in bad faith" or if the "totality of the circumstances ... demonstrates abuse."

▬▬▬ In *McKay* I held that the relevant inquiry is whether there has been an abuse of the Bankruptcy Code, rather than a mere mechanical assessment of various factors. *McKay,* 463 B.R. at 920 ("[T]he ultimate focus must remain on the concept of abuse."). I reiterate that conclusion and observe that the purpose of this provision is to weed out debtors who have spent lavishly, evaded payments, dealt with creditors in an unscrupulous manner, or otherwise misbehaved in a way that may not reach the level of misconduct or fraud that would lead to denial of discharge, but who nevertheless fall short of the historic notion of what constitutes an honest, but unfortunate, debtor.[26] *See id.* at 920, 925

---

**26.** To illustrate this distinction: in 1991, I held that intentional failure to obtain workers' compensation insurance gives rise to a § 523(a)(6) "willful and malicious injury" exception from discharge of a debt owed to a party who was injured in an accident that would have been covered by workers compensation had the policy been provided. *Hester v. Saturday (In re Saturday),* 138 B.R. 132 (Bankr.S.D.Ga.1991) (Davis, J.). The rationale was that the debtor had intentionally failed to obtain statutorily mandated cover-

("Congress recognized that established 'bad faith' precedent might be inadequate to cover all the instances of conduct which it perceived to be abusive, and in 2005 granted bankruptcy courts new authority to dismiss cases for conduct equally objectionable but factually dissimilar from the traditional bad faith line of cases ... to merit dismissal, a holistic view of Debtors' behavior must reveal conduct of similar seriousness under a 'totality of circumstances' analysis as has always warranted dismissal under a 'bad faith analysis.' ").

In this case the record is devoid of any evidence that Debtor fits into the abusive category of debtors. I have previously ruled that Debtor did not "fail" the means test, based as it is on facts as they existed at the moment of filing, so no adverse presumption of abuse arises. *In re Hardigan*, Case No., Dckt. No. 111 (Bankr. S.D.Ga. Dec. 20, 2012) (Davis, J.). Looking forward, the only circumstance which has been demonstrated is Debtor's ability to fund a partial, but meaningful repayment of his debt. However, there is no evidence of any misconduct, shady or unethical dealings with his creditors, or concealment or misrepresentation of his financial condition. Based on the foregoing, I find that Movants have not proven by a preponderance of the evidence under 11 U.S.C. § 707(b)(3)(B) that Debtor's Chapter 7 is an abuse of the letter and spirit of the Bankruptcy Code policy of providing a fresh start to the honest, but unfortunate debtor.

Certainly, in light of Debtor's earning capacity and his debt structure, these facts reach the outer limits of the concept that ability to pay, standing alone, is insufficient to support dismissal for abuse under a totality analysis. But the principle is correct, and to be faithful to that principle, this result is as well.

### ORDER

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that the Motions to Convert or Dismiss filed by SunTrust Bank and the United States Trustee are DENIED. The case will remain and be administered as a Chapter 7 case.

---

age, and it was foreseeable that a worker could be injured by what should have been a covered risk. As a result the worker suffered a financial injury as well—measured by the amount of mandated coverage. Later, in *In re Walker*, 48 F.3d 1161 (11th Cir.1995), the Eleventh Circuit ruled on similar facts that there was no malicious injury. It focused on the physical injury, which was not intended, rather than the financial loss which ensued as a result of the intentional failure to insure. *Id.* at 1164–65. It reasoned that the failure to obtain coverage was not the direct cause of the injury and rejected the *Saturday* notion that the economic injury was a foreseeable risk of willfully failing to provide the coverage. *Id.* at 1165. The Court acknowledged the failure to be potentially a criminal violation, but concluded that it was not a willful and malicious injury because, while reckless, it did not guarantee that the worker would suffer injury on the job. *Id.*

Thus, such debt is dischargeable in this Circuit. But arguably, a totality of circumstances analysis could still take into account a debtor's unlawful behavior in failing to provide mandated insurance coverage in the context of a § 707(b) motion to dismiss or convert.